UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| CANDACE WILSON-LOVE As executrix of the estate of William Martin Love, deceased and as Next Friend of C.W., K.L., and T.L., minors, | ) |
| Plaintiff, | ) |
| v. | ) No. 1:24-cv-01084-SEB-TAB |
| DEALER'S CHOICE TRUCKAWAY SYSTEM INC. d/b/a TRUCK MOVERS, STEVEN BURKE, DAIMLER TRUCK NORTH AMERICA LLC, | ) |
| Defendants. | ) |

**OMNIBUS ORDER**

This case arises out of a September 14, 2023, pedestrian-tractor collision that resulted in the untimely and tragic death of William Martin Love ("Mr. Love"), whose estate brought this wrongful death action against Defendants Dealer's Choice Truckaway System Inc. d/b/a Truck-Movers ("TruckMovers"); Steven Burke ("Mr. Burke"); and Daimler Truck North America LLC ("Daimler") (collectively, "Defendants"). Plaintiff, whom we shall refer to as "the Estate" unless specified otherwise, advances several legal doctrines by which to tag the named Defendants with liability for their alleged negligence, which purportedly caused and/or contributed to Mr. Love's passing. In this order, we undertake and resolve TruckMovers's and Daimler's Motions for Summary Judgment, dkt. 141, 146, as well as Defendants' myriad motions to strike, dkt. 197, 205, 272, 275, the parties' motions to exclude expert witnesses, dkt. 249, 253, 255, 257, 259, 266–68, 271, and the Estate's July 17, 2026, Motion for Leave to File a Third Amended Complaint, dkt. 354.

**SUMMARY JUDGMENT STANDARD**

"Although state law provides the substantive law in a diversity action," such as the one at bar, "summary judgment procedure is governed by federal law," which "defines the standard for evaluating the sufficiency of the evidence." *Maroules v. Jumbo, Inc.*, 452 F.3d 639, 645 (7th Cir. 2006). Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because summary judgment requires "no *genuine* issue of *material* fact," "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If reasonable persons could not find that the evidence justifies a decision for a party on each essential element, the court can grant summary judgment using federal standards." *Mouroules*, 452 F.3d at 645.

As the "put up or shut up" moment in a lawsuit, summary judgment requires parties to "show what evidence [they] ha[ve] that would convince the trier of fact" to find in their favor on any disputed elements. *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014). A movant's "facts as claimed and supported by admissible evidence . . . are admitted without controversy" unless "the non-movant specifically controverts the facts . . . with admissible evidence." S.D. Ind. L.R. 56-1(f). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Anderson,* 477 U.S. at 249–50).

## BACKGROUND

### I. Preliminary Issues

#### A. Defendants' Motions to Strike the Estate's Objections [Dkt. 197, 205]

On October 30, 2025, Daimler and TruckMovers (joined by Mr. Burke, dkt. 145) moved for summary judgment, respectively, on all claims asserted again them. Dkt. 146, 141. The Estate's response briefs in opposition to each motion were filed on November 29 and December 2, 2025, respectively. Dkt. 172, 177. Nearly two weeks later, on December 12, 2025, the Estate filed two documents enumerating a litany of objections to the evidence submitted and relied upon by Defendants on summary judgment. Dkt. 193, 194. That same day, Daimler timely filed its reply brief, dkt. 195, as did TruckMovers three weeks later, on December 22, 2025, dkt. 204. Meanwhile, on December 15, 2025, and December 22, 2025, Daimler and TruckMovers, respectively, moved to strike the Estate's separately filed objections as violative of our Local Rules. Dkt. 197, 205. Since resolution of these fully-briefed motions to strike affects our review of the summary judgment record, we turn to address them now.

Our Local Rules advise litigants as follows: "The court disfavors collateral motions—such as motions to strike—in the summary judgment process. Any dispute over the admissibility or effect of evidence must be raised through an objection within a party's brief." S.D. Ind. L.R. 56-1(i). "[T]he directives of Local Rule 56-1(i) are mandatory and unambiguous: Challenges to the admissibility or effect of evidence 'must be' raised within a party's brief." *Denoia v. Roche Diagnostics Corp.*, No. 1:23-CV-00344-SEB-TAB, 2024 WL 5186873, at *8 (S.D. Ind. Dec. 20, 2024).

Defendants contend that the Estate's failure to incorporate its evidentiary objections within its response brief(s) precludes it from raising such objections nearly two weeks later by separate

filings. The Estate raises several countervailing arguments to support its belated objections, though none is ultimately availing.

First, the Estate reveals, albeit without further elaboration, that its objections were "inadverten[tly]" omitted from its initial response briefs and "promptly" filed on December 12, 2025, before Daimler's and TruckMovers's reply deadline on December 13, 2025. (TruckMovers's reply deadline was extended through December 22, 2025, however. Dkt. 185.) To the extent that we "may, in the interest of justice or for good cause, excuse failure to comply strictly" with our summary judgment procedures, the Estate's unexplained "inadvertence" does not satisfy this standard. S.D. Ind. L.R. 56-1(*l*). "Courts expect parties to know and follow local rules of practice. Failing to do so can prove fatal." *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 525 (7th Cir. 2020).

Second, the Estate's response brief includes a passing request for "leave to submit objections." Dkt. 200 at 2. Once again, the Estate's litigation strategy fails to comply with our Local Rules, which explicitly prohibit parties from embedding motions within response briefs to a previously filed motion. S.D. Ind. L.R. 7-1(a). We reject the Estate's passing request and shall not address it further.

Third, the Estate argues that "there is no cognizable harm or prejudice to Defendant[s]" and that Defendants "cannot plausibly claim surprise or disadvantage," since they bear the burden of presenting admissible evidence and since the Estate's objections were in any event asserted before Defendants' respective reply deadlines. Dkt. 200 at 2; dkt. 211 at 3. That the Estate's objections technically appeared on our docket prior to Daimler's and TruckMovers's respective reply deadlines is neither conclusive nor persuasive evidence of a lack of surprise or disadvantage, particularly with regard to Daimler, whose reply brief was due on the same date that the Estate filed its

objections. Accordingly, the Estate's appeal to the arguable lack of prejudice to Defendants is not persuasive.

We recognize that Defendants' motions to strike might, at first glance, appear inconsistent with the text of Local Rule 56-1(i), which expresses that "[t]he court disfavors collateral motions—such as motions to strike—in the summary judgment process." S.D. Ind. L.R. 56-1(i). A cursory review of the instant docket reveals the reason(s) piecemeal and collateral motions, like those interposed by the parties here, are disfavored: In this multi-defendant litigation, the parties' inability (or unwillingness) to find common ground has engendered an exceedingly high number of motions and related submissions whose quantity and volume alone have stymied what might have been a straightforward resolution of this case. *See generally* dkt.[1] For the reasons stated above, however, the instant motions to strike were appropriate responses to the Estate's improper attempt to supplement perceived deficiencies in its initial summary judgment opposition briefs. Daimler's and TruckMovers's Motions to Strike the Estate's Objections therefore shall be **granted**, dkt. 197, 205, and the Estate's Objections are **stricken** accordingly, dkt. 193, 194.

### B. Summary Judgment Procedure & the Instant Record

Before turning to our overview of the facts underlying this litigation, we pause to discuss our expectations regarding the parties' compliance with summary judgment procedures and to clarify how the parties' respective shortcomings have negatively impacted our analysis. Recognizing

[1] For reasons that are not readily apparent to us, the parties have flooded our docket with nearly three dozen "notices" of depositions and the like. *See generally* dkt. 46–52, 116–24. Given that no rule of federal procedure nor of our Local Rules requires litigants to apprise the court of each and every pre-trial development, we can discern no legitimate basis for the parties' treatment of this court's docket as a general repository for their litigation-related documents. *See* Fed. R. Civ. P. 5(d) (outlining the circumstances under which a party need not file a certificate of service); 2000 Committee Note to Fed. R. Civ. P. 5(d) (explaining that discovery requests, including deposition notices, "must not be filed until they are used in the action").

that summary judgment motions are often "tedious and time consuming," our Local Rules require parties to "submit factual statements to assist with identifying and isolating the disputed from the undisputed—all to help the court assess whether a particular claim should proceed to trial or instead can be resolved on the existing record." *Hinterberger*, 966 F.3d at 527 (citing S.D. Ind. L. R. 56-1). Our Local Rules specifically require a non-moving party to respond with a "Statement of Material Facts in Dispute" that "identifies the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment." S.D. Ind. L.R. 56-1(b).

"Properly substantiating assertions is a basic legal obligation. Doing so takes on a particular form and importance for the plaintiff at summary judgment." *Brown v. Chicago Transit Auth.*, 179 F.4th 577, 586 (7th Cir. 2026) (discussing summary judgment procedure under Rule 56 as well as the Northern District of Illinois's Local Rules). As such, parties' factual assertions must be supported with citations to the evidentiary record in a manner that facilitates the court's ability to review the disputed and undisputed facts. S.D. Ind. L.R. 56-1(e). In terms of how the parties file exhibits on the court docket, Local Rule 5-6(a) provides, in relevant part, that "[e]ach electronically filed exhibit to a main document must be . . . given a title which describes its content." S.D. Ind. L. R. 5-6(a) (emphasis added). In the Seventh Circuit's oft-quoted refrain, "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Brown*, 179 F.4th at 587 (citation modified); *accord* S.D. Ind. L.R. 56-1 cmt. (e).

Relatedly, litigants' factual recitations "should contain concise statements of fact, not extended statements of argument." *Pike v. Caldera*, 188 F.R.D. 519, 525 (S.D. Ind. 1999) (discussing since-amended Local Rule); *see* S.D. Ind. L.R. 56-1 cmt. (a) (Statement of facts must "state facts,

not the party's argument."); *Hinterberger*, 966 F.3d at 527 (stating that the Local Rules "prohibit[ ] the inclusion of any argument—which should be saved for briefing"). "[F]actual inferences do not constitute an appropriate inclusion" in a statement of facts, for courts "must have a clear picture of the facts" before deriving reasonable inferences therefrom. *Pike*, 188 F.R.D. at 525.

Here, several aspects of the parties' summary judgment submissions fall short of these guidelines. First, as highlighted by Defendants, the Estate's response briefs contain a "Statement of Material Facts," dkt. 172 at 2, and a "Summary of Material Facts and Evidence," dkt. 177 at 3, rather than a "Statement of Material Facts in Dispute," as required by Local Rule 56-1(b). Although the Estate technically violated our Local Rules, we decline to assign this error any dispositive weight in our resolution of the summary judgment motions. A more problematic dereliction, however, arises with the Estate's overall failure to support its factual assertions with evidentiary citations—either entirely or to *specific* portions of the record. *E.g.*, dkt. 172 at 4, 6–7; dkt. 177 at 3, 6–7. *See also* dkt. 172 at 5 (citing "Exhibit G," a 335-page document). To the extent that the Estate's factual presentation has fallen short of our firmly-established summary judgment standards, we have decline to squander our limited judicial resources to "scour the record" in an attempt to piece together the Estate's case and instead will exclude those factual assertions from our review. *See* Fed. R. Civ. P. 56(c)(3).

Additionally, our review of the parties' summary judgment briefs reveals that all have confusingly comingled their facts and argument as well as misrepresented the record, hindering what ought to be a straightforward recitation of the facts. Relatedly, with the exception of the parties' various arguments concerning their expert witnesses (which are addressed and resolved, *infra*), the parties have also interposed numerous evidentiary objections, the majority of which are either legally and/or factually underdeveloped, *see* dkt. 204 at 5–7 (TruckMovers's objections to the

Estate's supporting evidence); dkt. 210 at 15 (the Estate's response to TruckMovers's objections), or an effort to counter an opposing party's editorialization regarding the facts, *see* dkt. 210 at 7. It is beyond the court's obligations to research and construct arguments on litigants' behalf; thus, we decline to resolve the parties' bareboned objections and argumentative equivocations. We shall "handle[ ] the [remaining] factual discrepancies below by accurately representing the record, by properly applying the summary judgment standard of review, and by noting in footnotes where the parties were misguided." *Ohaeme v. Andy Mohr Avon Nissan*, No. 1:23-cv-00181-JMS-KMB, 2024 WL 4932038, at *4 (S.D. Ind. Dec. 2, 2024).

## II. Factual Background

By way of a reminder, we note that "[t]he facts stated below are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to 'the party against whom the motion under consideration is made.' " *Id.* (quoting *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526–27 (7th Cir. 2005)).

### A. The Defendants

Defendants' businesses involve the domestic trucking industry. On September 6, 2023, Daimler purchased a 2020 Cascadia Freightliner tractor (the "tractor") from non-party J.B. Hunt. Dkt. 150-3 at 2. Soon thereafter, Daimler, through non-party **Daimler Trucks Remarketing ("DTR")**, retained TruckMovers to transport the tractor from Mt. Pleasant, Wisconsin, to Houston, Texas. Dkt. 142-2 at 3; Bross Dep. 19:13–14, dkt. 150-4 at 4 (Deposition of TruckMovers's Corporate Representative David Bross). (Daimler avers, and the Estate does not refute, that DTR is Daimler's wholly owned subsidiary. Dkt. 148 at 1, 9.)

TruckMovers hired Mr. Burke, a commercial truck driver, to complete the drive from Wisconsin to Texas, though it is not entirely clear when exactly Mr. Burke obtained possession of the tractor. Bross Dep. 18:21–14, dkt. 150-4 at 4; McCartney Dep. 67:22–68:25, dkt. 142-3 at 2–3. Although Mr. Burke and TruckMovers's employment contract designates Mr. Burke as an independent contractor, TruckMovers has admitted, for purposes of this litigation, that Mr. Burke was its employee and that the underlying incident occurred within the course and scope of Mr. Burke's employment. Bross Dep. 31:3–8, dkt. 150-4 at 7; TruckMovers's Answer ¶ 10, dkt. 85; Dkt. 142-3 at 4–12 (Burke-TruckMovers Independent Contractor Driver Service Agreement).

**B. The Incident**

The underlying incident occurred on September 14, 2023, at approximately 9:40 p.m., at the intersection of North Centennial Street and West 10th Street, located within an urban and residential area of Indianapolis, Indiana. Dkt. 142-8 at 1. The atmospheric conditions at the time were clear, dry, and dark. *Id.* Mr. Burke, who had parked the tractor on the west side of North Centennial facing south, entered the roadway heading towards the stop sign at the intersection with West 10th Street. The purpose and duration of Mr. Burke's visit to the Indianapolis area that evening remains unclear, though Mr. Burke stated during his deposition that he had been in the neighborhood visiting friends. Burke Dep. 21:13–22:1, dkt. 195-7 at 5–6. A nearby surveillance camera[2] recorded the following sequence of events:

At approximately 9:41 p.m., Mr. Love was seen walking southbound along the sidewalk on the west side of North Centennial towards the stop sign at the intersection North Centennial

[2] Specific details about the camera itself, including its physical proximity to the scene of the accident, have not been disclosed by the parties, but from our review of the footage the camera appears to have been positioned on the west side of North Centennial facing south (towards the intersection with West 10th). *See generally* dkt. 153 (manual filing).

Street and West 10th Street. Video at 9:41:09–16, dkt. 153 (manual filing).[3] Meanwhile, Mr. Burke had pulled the tractor onto the roadway and was headed towards the stop sign posted at the same intersection. *Id.* Before reaching the stop sign (where the sidewalk meets the curb), Mr. Love is seen maneuvering around a guy wire before stopping on the strip of grass separating the sidewalk from the roadway, where he remained standing for several seconds. *Id.* at 9:41:16–21.

As Mr. Burke approached the stop sign, he slowed down in an apparent effort to account for oncoming vehicular traffic—but did not come to a complete stop—before executing a left turn onto West 10th Street, at which time Mr. Love, while apparently viewing an illuminated handheld device,[4] also entered the roadway to cross the street. *Id.* at 9:41:22–25. As Mr. Love proceeded to walk behind the tractor, he made contact with its rear right-side tires, which pulled him under and crushed him as the tractor drove away. *Id.* at 9:41:25–28. The recorded view of these critical moments is partially obstructed by the presence of a parked sedan and a telephone pole; however, shouts can be heard in the footage as Mr. Love was pulled underneath the tractor. *Id.* Additionally, the tractor's right taillights can be seen rising and falling as the tractor drove over Mr. Love's body. *Id.* Shortly thereafter, Mr. Love tragically succumbed to his injuries. Dkt. 142-8 at 3.

### C. Post-Accident Drug Testing

Following the arrival of law enforcement at the scene, Mr. Burke declined to voluntarily submit to a drug test, as required by Indiana law. Dkt. 177-2 (citation for violation of Indiana Code § 9-30-7-5). During his subsequent deposition, Mr. Burke admitted that he had declined to take the drug test because he knew that the results would reveal the presence of cocaine in his system.

[3] For clarity, we cite the timestamps depicted in the top left corner of the video footage.
[4] TruckMovers asserts that the video depicts Mr. Love wearing headphones as well. Dkt. 142 at 4. Based on our review of the footage, we find that Mr. Love's potential headphone usage is at best disputable, and thus we do not treat TruckMovers's assertion as an undisputed fact.

Burke Dep. 19:24–20:5, dkt. 195-7 at 3–4.[5] Mr. Burke eventually did submit to a urinalysis the following day, approximately twenty hours after the accident, which confirmed the presence of cocaine metabolites in his system. Dkt. 177-1. (According to Michael Suls ("Dr. Suls"), the Medical Review Officer who assessed Mr. Burke's test results, cocaine can remain detectable in urine for "24 up to 72 hours." Suls Dep. 23:17–25, dkt. 142-10 at 3.) Based on test results alone, however, "it's not possible" to determine when the user ingested the substance and/or when (or whether) the user experienced the substance's intoxicating effects. *Id.* at 24:1–21, dkt. 142-10 at 4. How cocaine affects its user also depends upon the pattern and duration of use. *Id.* at 25:2–9, dkt. 142-10 at 5. In this case, Dr. Suls reviewed only the results of Mr. Burke's post-accident drug test from which he was unable to discern whether, when, or to what degree Mr. Burke might have been impaired by cocaine. *See id.*

Officer Steven Baumer ("Officer Baumer"), who responded to the scene, testified at his deposition that he shared "at least one conversation" with Mr. Burke that "was very short." Baumer Dep. 47:3–6, dkt. 142-11 at 2. Officer Baumer also disclosed that he is trained to detect signs of impairment and intoxication, though he "d[id] not remember" whether his conversation with Mr. Burke led him to suspect Mr. Burke's potential impairment or intoxication. *Id.* at 47:17–23, 48:7–14, dkt. 142-11 at 2–3.[6]

---

[5] The Estate cites various portions of Mr. Burke's deposition testimony that do not appear in the record before us. *Contrast* dkt. 177 at 3, 5 (citing Mr. Burke's deposition transcript as "Exhibit I"), *with* dkt. 177-9 (Exhibit I, which contains a certificate of Mr. Burke's nonappearance for his October 22, 2025, deposition only). To the extent that the Estate seeks to rely on portions of Mr. Burke's deposition testimony that do not appear in the record, such assertions are omitted from consideration.

[6] In an example of TruckMovers's "loose allegiance" to the summary judgment standard, *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021), TruckMovers cites this testimony as evidence that Officer Baumer "had no concerns that Burke was impaired or intoxicated." Dkt. 142 at 6. In viewing the record in the light most favorable to the Estate, we do not credit TruckMovers's representation of Officer Baumer's testimony.

With regard to Mr. Love, subsequent testing revealed the presence of cannabinoids in his system as well as a blood alcohol content of .084. Dkt. 142-7 at 1.

**D. Daimler's Buy-Back Program**

Daimler's product and service offerings include a buy-back program whereby Daimler repurchases heavy-duty trucks, which it manufactured, and refurbishes the vehicles to be resold on the used heavy-duty truck market. Cummings Rep. 3–4, dkt. 150-9 at 4–5. Daimler and TruckMovers share a long-standing business relationship with each other whereby TruckMovers transports Daimler's repurchased tractors. *Id.*

The terms of this driveaway-towaway arrangement were memorialized in the April 2022 **Master Services Agreement (the "MSA")** to which DTR and TruckMovers are both parties. MSA 1, dkt. 150-6 at 2. Under the terms of the MSA, TruckMovers retains "sole and exclusive care, custody, and control of all vehicles from the time of tender by [DTR to TruckMovers] for transportation until delivery to cosignee." *Id.* at 4, dkt. 150-6 at 5. Under the MSA, TruckMovers promised to adhere to the Federal Motor Carrier Safety Regulations (the "FMCSRs"), which govern registration, insurance, and safety requirements; to maintain safe equipment; to employ fully qualified personnel; and to achieve a ninety-eight on-time percentage. MSA 2, dkt. 150-6 at 3.

On May 1, 2022, DTR and TruckMovers entered into a **Service Specification (the "Service Specification")**, which incorporated by reference the terms of the MSA. Service Specification 1, dkt. 172-3. Under the Service Specification, TruckMovers agreed to transport designated vehicles in accordance with the terms and conditions stated therein as well as "the instructions and guidelines contained in the Daimler Trucks Remarketing Corporation," including the "Vehicle Handling and Passenger Car Operations Manuals and the Transportation Claims Policy and Procedures Manual," which policies only DTR has discretion to amend. *Id.* The Service Specification

also required TruckMovers to utilize DTR's "Communication Link ('CCL'/TruckMovers.com) system" in order to facilitate "the transmission of shipping information." *Id.* at 2.

In the words of TruckMovers's Corporate Representative, David Bross ("Mr. Bross"), "[w]hen TruckMovers picks up a truck and delivers it," TruckMovers is "responsible for that truck and responsible for [the] driver. [TruckMovers] put[s] the driver in the truck. Daimler doesn't have anything to do with it." Bross Dep. 28:14–18, dkt. 150-4 at 6. Indeed, Mr. Bross also testified at his deposition that TruckMovers manages all aspects of truck movement, including, *inter alia*, the routes, drivers, and scheduling. *Id.* at 124:16–127:20, dkt. 150-4 at 9–10. Because TruckMovers typically does not own the vehicles it transports, TruckMovers does not oversee general maintenance and upkeep. *Id.* at 15:13–17, dkt. 142-1 at 2. A Daimler representative testified similarly during his deposition that Daimler has "no say or involvement with" TruckMovers's driver selection or route assignments. DeGroat Dep. 42:4–15, 48:2–6, dkt. 150-11 at 3, 4. Mr. Burke also testified at his deposition that, prior to September 14, 2023, he did not interact with anyone at Daimler. Burke Dep. 20:21–21:8, dkt. 195-7 at 4–5.

**E. The Tractor**

The parties have raised several arguments concerning the tractor's fault code history, which arguments we shall discuss and resolve in the context of the parties' challenges to each other's expert witnesses. That said, the undisputed record evidence establishes as follows:

According to Daimler's Executive Engineer Christopher M. Rieflin ("Mr. Rieflin"), a February 7, 2024, inspection of the tractor revealed that no fault codes directly related to braking and/or driver control were active at the time of the accident. Rieflin Decl. ¶¶ 4–5, dkt. 150-12. Mr. Rieflin also states in his Declaration that the tractor was not equipped with Daimler's proprietary

side object detection technology, Side Guard Assist, as such technology was not available at the time that the tractor was manufactured. *Id.* ¶ 6.

### F. Mr. Love & Minors C.W., T.L., and K.L.

At the time of his death, Mr. Love was thirty-six years old and unmarried. Dkt. 142-12 at 3. Sala Rene Williams Allen ("Ms. Allen") is the custodial parent and mother of C.W., and Daivon Thompson ("Ms. Thompson") is the mother of K.L. and T.L., who reside with their maternal aunt. Dkt. 142-12 at 3. Mr. Love and Ms. Thomspon cohabitated for several years, between 2007 and 2012 approximately, during which time K.L. and T.L. were born. Thompson Dep. 18:3–20:7, dkt. 142-13 at 2. Mr. Love and Ms. Thompson never married. *Id.* Mr. Love and Ms. Allen were engaged for an unspecified period of time that preceded C.W.'s birth, though their relationship ended sometime in 2016. Allen Dep., dkt. 142-14 at 2. TruckMovers requested from the Estate copies of C.W.'s, K.L.'s, and T.L.'s birth certificates, to which the Estate responded indicating that it did not have any such responsive documents. Dkt. 142-15 at 6.

### G. Procedural History

The Estate initiated this wrongful death action in state court on May 22, 2024, and the matter was timely removed to federal court on the basis of our diversity jurisdiction. The operative Second Amended Complaint (the "SAC") alleges that Defendants' negligence caused the wrongful death of Mr. Love. Dkt. 66.

On October 30, 2025, TruckMovers (joined by Mr. Burke) and Daimler moved for summary judgment, respectively. Dkt. 141, 146. Those motions are fully briefed and await a ruling.

On February 20, 2026, while the summary judgment motions remained pending, Defendants moved to exclude the testimonies of the Estate's various expert witnesses, dkt. 248–49, 251, 253, 255, 257, 259. Three days later, on February 23, 2026, the Estate filed three motions to

exclude the testimonies of Defendants' witnesses, Rachel Kelly, Jerad Childress, and Madeleine J. Swortwood. Dkt. 266–68. A day later, on February 24, 2026, the Estate moved to exclude the expert testimony of Kirk Cummings. Dkt. 271. Shortly thereafter, on February 25, 2026, Defendants jointly moved to strike the Estate's allegedly untimely motions to exclude. Dkt. 272, 275. These motions are also fully briefed and await a ruling.

Meanwhile, on April 21, 2026, we issued an order granting in part and denying in part Defendants' respective motions for judgment on the pleadings. Dkt. 315. We held, *inter alia*, that TruckMovers's admission that Mr. Burke was acting within the scope of his employment precluded the Estate's direct negligence claims against TruckMovers; that dismissal of the Estate's joint enterprise theory of liability was premature, as was Defendants' requests that we "dismiss" certain categories of damages sought by the Estate; and that the Estate's failure to plead sufficient facts concerning the minors' dependency upon Mr. Love precluded recovery under Indiana's General Wrongful Death Statute (the "GWDS"). We also addressed the issue of federal preemption under the Federal Aviation Administration Authorization Act (the "FAAAA"), 49 U.S.C. § 14501(c)(1), and held that the FAAAA preempted the Estate's negligent selection claim against Daimler.

Several months thereafter, on July 16, 2026, we issued an order granting in part and denying in part the Estate's motion for reconsideration of our April 21st Order. In light of the recent Supreme Court decision concerning FAAAA preemption, we reinstated the Estate's negligent selection claim against Daimler. *See Montgomery v. Caribe Transport II, LLC*, 146 S. Ct. 1199, 1204–05 (2026). We declined to reconsider our ruling on the sufficiency of the Estate's dependency allegations apropos of the GWDS, since the Estate's defense of its pleadings reflected arguments that should have been interposed earlier.

On July 17, 2026, the day following the denial of the Estate's motion to reconsider, the Estate filed a (fifth) motion for leave to amend the complaint in order to incorporate allegations of the minors' dependency and heirship, pursuant to the GWDS. Dkt. 354. The Estate's motion to amend has generated fervent opposition from Defendants, who filed a joint response brief on July 31, 2026. Dkt. 358. The Estate filed a reply brief on August 5, 2026. Dkt. 359. Thus, the Estate's motion to amend is fully briefed and ripe for ruling. The parties' various motions *in limine* shall remain pending to be resolved hereafter in due course.

## DISCUSSION

The operative complaint asserts myriad theories of liability through which the Estate seeks to recover damages based on Mr. Love's untimely death caused by Defendants. With the exception of TruckMovers's vicarious liability as Mr. Burke's employer, the Estate's many standalone theories of liability against Daimler and TruckMovers are largely underdeveloped and ultimately unavailing. As for Mr. Burke (and his employer, TruckMovers), the existence of material factual disputes also precludes a final resolution of these issues on summary judgment. Before turning to the parties' various arguments relating to negligence, we shall turn to address the numerous challenges to the parties' expert witnesses.

### I. Motions to Exclude Expert Testimony

Because "only admissible evidence" aids a party's efforts to defeat summary judgment, district courts may appropriately make "evidentiary rulings on proposed expert testimony in conjunction with summary judgment orders." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a)

> the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In short, trial judges must "ensure that any and all expert testimony or evidence 'is not only relevant, but reliable.' " *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). "No matter the nature of the witness's expertise, Rule 702 'establishes a standard of evidentiary reliability,' 'requires a valid connection to the pertinent inquiry as a precondition to admissibility,' and mandates that the testimony have 'a reliable basis in the knowledge and experience of the relevant discipline.' " *Id.* (cleaned up) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147–49 (1999)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis*, 561 F.3d at 705.

In performing this "gatekeeper role" under Rule 702 and *Daubert*, we evaluate the following three factors bearing on the admissibility of the expert testimony: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). Once a proposed expert's testimony satisfies the threshold relevance and reliability requirements, "the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.' " *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Daubert*, 509 U.S. at 596).

Here, we address the parties' various challenges to each other's expert witnesses only insofar as those expert witnesses have been proffered as such on summary judgment. (For this reason,

Defendants' joint motions to exclude Stan Smith, dkt. 248, and Eric Wozniak, dkt. 251, shall remain pending, as neither witness's proposed expert testimony was relied upon by the Estate on summary judgment.)

**A. Eric Ball [Dkt. 253, 259]**

The Estate identifies Texas law enforcement officer Eric Ball ("Officer Ball") as an expert in commercial motor vehicle operations and compliance. Officer Ball holds a Master of Business Administration from the University of Phoenix as well as nearly two decades of combined experience in state law enforcement, FMCSR enforcement, and motor carrier safety management. Ball Report 2, dkt. 260-4. As a police officer since 2006, Officer Ball is well-versed in commercial motor vehicle inspections and the requirements of the FMCSRs as well as the Commercial Vehicle Safety Alliance ("CVSA"). Dkt. 260-1 at 2 (Officer Ball's CV). According to the Estate, Officer Ball's investigative background also encompasses his "assisting crash reconstruction investigators by evaluating the driver's actions prior to the collision, at the time of the crash, and during the post-crash inspection process." Dkt. 288 at 8. Officer Ball has held a commercial driving learner's permit in the past, meaning that he is authorized to operate a commercial vehicle so long as a fully licensed commercial driver is present in the vehicle as well. Ball Dep. 140:18–141:4, dkt. 195-1. In 2019, Officer Ball founded TruckEstate Consulting Group ("TruckEstate") and currently serves as the CEO. Dkt. 260-1 at 1. Through TruckEstate, Officer Ball provides expert analysis relating to civil truck litigation; educates and coaches clients on fleet safety, compliance, and business development; and conducts mock inspections and fleet safety audits. *Id.*

In this litigation, the Estate seeks to call Officer Ball as an expert witness to opine that it was several independent safety failures in the operation of the tractor that caused Mr. Love's death. *See* dkt. 177 at 5; *see generally* Ball Report 13–15, dkt. 260-4. Officer Ball's Report advances

several opinions regarding the specific cause of the fatal collision between Mr. Burke and Mr. Love, i.e., his opinions that Mr. Burke's "impaired condition, refusal to submit to chemical testing, and associated FMCS[Rs] violations" all contributed to Mr. Love's death. Ball Report 13, dkt. 260-4. Officer Ball also opines that "the impaired operation of the vehicle, compounded by mechanical and regulatory deficiencies, directly caused or substantially contributed to the fatal injuries sustained by Mr. Love." *Id.* During his deposition, Officer Ball testified that the fatal collision could have been avoided if Mr. Burke had completely stopped at the stop sign, as the law requires. Ball Dep. 264:15–265:23, dkt. 195-1.

Defendants have moved to exclude the entirety of Officer Ball's proposed testimony on the grounds that Officer Ball is unqualified to testify as an expert witness because (1) he is a partisan advocate, rather than an unbiased expert; (2) he lacks the credentials to opine on matters of impairment/toxicology, human factors, and accident reconstruction; and (3) he is not qualified to testify about fault codes. Dkt. 253. Daimler similarly argues that Officer Ball is unqualified with regard to fault codes; that his fault code opinions are not the product of reliable principles and methodology; that his fault code opinions are not relevant; and that he is not qualified to interpret the Federal Motor Carrier Safety Regulations. Dkt. 259. Defendants' Motions to Exclude Officer Ball's Opinions are fully briefed and ripe for ruling.

*1. Officer Ball's Neutrality as an Expert Witness*

TruckMovers and Mr. Burke's contend that Officer Ball's expert opinion is not reliable due to his allegedly overt bias in favor of the Estate. According to TruckMovers and Mr. Burke, Officer Ball along with his consulting firm TruckEstates actively and openly solicit clients on behalf of The Withspoon Law Group, which firm represents the Estate in this litigation. This commercial relationship is evinced by TruckEstates's various social media posts directing viewers to contact

The Witherspoon Law Group. Officer Ball's expert testimony is inadmissible, Defendants argue, because Officer Ball has "crossed the line into an advocate for [the Estate]," rendering him a biased spokesperson for the Estate's legal claims. Dkt. 254 at 5.

"Bias is a 'permissible and established basis of impeachment.' " *Abernathy v. E. Illinois R.R. Co.*, 940 F.3d 982, 992 (7th Cir. 2019) (quoting *United States v. Abel*, 469 U.S. 45, 50 (1984)). As a "quintessentially appropriate topic for cross examination," bias does not constitute grounds for the wholesale exclusion of a witness's testimony. *Id.* (quoting *Bachenski v. Malnati*, 11 F.3d 1371, 1375 (7th Cir. 1993)). Accordingly, challenges to Officer Ball's bias and motive for testifying are "fair game" in terms of expected litigation strategy and Defendants' efforts to undermine Officer Ball's credibility as a witness. *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 762 (7th Cir. 2013). Insofar as Officer Ball's testimony exceeds the boundaries of his expertise and "transforms the expert into an advocate," Defendants may interpose such objections at trial. *Williams v. Mary Diane Schwarz, P.A.*, No. 15 C 1691, 2018 WL 2463391, at *9 (N.D. Ill. June 1, 2018). However, such concerns do not warrant the wholesale exclusion of Officer Ball's testimony. Thus, Officer Ball's testimony shall not be excluded on grounds of bias.

*2. Officer Ball's Qualifications & Methodology*

TruckMovers and Mr. Burke also challenge Officer Ball's qualifications to opine on topics relating to drug impairment and toxicology, human factors, and accident reconstruction, as Officer Ball himself admitted during his deposition that he is not an expert in those fields. Ball Dep. 57:18–20, 139:18–140:2, 256:18–21, dkt. 195-1. All Defendants contend that Officer Ball lacks the expertise to opine on matters related to fault codes and that, in any event, Officer Ball's fault code opinions are not the product of a reliable methodology. Daimler also asserts that Officer Ball is not

qualified to interpret the requirements of the FMCSRs. Because Defendants' arguments pertain to both Officer Ball's qualifications as well as his methodology, we address these issues together.

**Drug impairment & toxicology**: Officer Ball's Report repeatedly references Mr. Burke's "impaired condition" as a contributing factor to the accident. Ball Report 7, 13, dkt. 260-4. According to Officer Ball's Report, Mr. Burke's refusal to voluntarily submit to a post-accident drug test rendered him legally unqualified to operate a commercial motor vehicle under federal regulations as well as TruckMovers's company policy. Ball Report 7–9, dkt. 260-4. TruckMovers and Mr. Burke contend that Officer Ball lacks the credentials to render any opinion about Mr. Burke's alleged impairment and that, in any event, such opinion is not supported by a reliable methodology.

As a highway enforcement officer, Officer Ball has had extensive experience conducting traffic stops, making arrests, and issuing citations to drivers and motor carriers for violations of state statutes and federal regulations. Ball Aff. ¶ 15, dkt. 288-1.[7] Defendants emphasize that Officer Ball admitted during his deposition that he is neither a medical doctor nor a toxicologist; however, such admissions are not necessarily dispositive of his expertise and/or whether his testimony surpasses the reliability threshold. Rather, "a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Although Officer Ball's law enforcement experience might qualify him to testify as to matters of impairment detection, his opinion in this case that Mr. Burke's alleged impairment caused

[7] Attached to the Estate's response in opposition to TruckMovers's Motion to Exclude the Opinions of Eric Ball is Officer Ball's Affidavit, wherein he bolsters certain aspects of his credentials as well as the methodology underlying the opinion he offers in this litigation. Although TruckMovers and Mr. Burke refer to this exhibit as "a new, self-serving affidavit," they do not request that we exclude it from our consideration. Dkt. 308 at 3.

or contributed to Mr. Love's death is not supported by a reliable methodology that might otherwise assist the trier of fact in assessing causation. Beyond noting that Mr. Burke's refusal to submit to a post-accident drug test "was consistent with concealment behavior commonly observed in post-accident drug use investigations," Officer Ball assumes the fact of Mr. Burke's impairment without identifying *how* Mr. Burke's behavior at or around the time of the accident actually evince his impairment or intoxication. Ball Report 13, dkt. 260-4.

Certain aspects of Officer Ball's deposition testimony further call into question the reliability of his expert opinion. For example, Officer Ball agreed that a positive drug test is not conclusive proof of a person's intoxication; that no officer who responded to the scene detected signs that Mr. Burke might be impaired; and that his review of the evidence did not reveal any obvious indications of drug impairment. Ball Dep. 271:5–272:6, dkt. 195-1. Coupled with Officer Ball's testimony that he knew neither the time nor the quantity of Mr. Burke's cocaine usage vis-à-vis the accident, Officer Ball's opinions as to how Mr. Burke's drug impairment caused Mr. Love's death are not the product of a reliable methodology and are therefore inadmissible. *Id.* at 207:3–15.

In short, Officer Ball opinion identifying Mr. Burke's drug impairment as a cause of the fatal collision is not supported by reliable methodology, creating "an unacceptable analytical gap between the data [Officer Ball] reviewed and the opinion he" seeks to proffer. *Dahl v. Hofherr*, No. 3:14-cv-1734-MGG, 2016 WL 8668498, at *7 (N.D. Ind. Nov. 18, 2016). His opinion that Mr. Burke's drug impairment caused or contributed to Mr. Love's death shall be excluded accordingly.

**Human Factors & Accident Reconstruction**: Officer Ball has opined that Mr. Burke's failure to completely stop at the white stop sign bar contributed to the accident. Ball Dep. 265:2–23, dkt. 195-1. Officer Ball testified at his deposition that "the driver should have stopped, looked both ways, cleared the intersection, and then made a turn." *Id.* As with matters of drug impairment

and toxicology, Officer Ball admitted during his deposition that he is not an expert in human factors or accident reconstruction. *Id.* at 139:18–140:2, 149:3–7. Officer Ball also disclosed during his deposition that he "took the [tractor's] blind spots into consideration," though he did not model the tractor's blind spots with regard to the "exact" lefthand turn taken by Mr. Burke in this case. *Id.* at 229:16–24.

TruckMovers and Mr. Burke argue that Officer Ball's opinion that Mr. Burke's failure to stop caused the accident is inadmissible because Officer Ball lacks expertise in accident reconstruction and/or human factors. Although Officer Ball potentially could testify to how Mr. Burke's driving deviated from the standard of care of a safe truck driver, the Estate does not defend Officer Ball's testimony on this basis. Rather, the Estate responds by reiterating that Officer Ball has "routinely work[ed] alongside accident reconstructionists" and has "assist[ed] crash reconstruction investigators by evaluating the driver's actions prior to the collision, at the time of the crash, and during the post-crash inspection process in accordance with" the FMCSRs. Dkt. 288 at 8, 24, 26; Ball Aff. ¶ 7, dkt. 288-1. The Estate also adds that Officer Ball's continuing professional training entails coursework in crash investigation and reconstruction. Dkt. 288 at 9; Ball Aff. ¶ 8, dkt. 288-1.

On this record, we cannot agree with the Estate that Officer Ball's prior experience "working alongside" accident reconstructionists or assisting in crash reconstruction investigations is a sufficient basis on which to render him an expert in accident reconstruction. That Officer Ball's professional development courses have included some coverage of accident reconstruction similarly does not suffice to qualify him as an expert in the field. Indeed, Officer Ball does not hold himself out as an accident reconstruction expert. Ball Dep. 139:18–20, dkt. 195-1. As such, we fail

to see any credentials Officer Ball possesses that qualify him to opine that Mr. Burke's failure to heed the posted stop sign caused or contributed to the collision with Mr. Love.

Assuming Officer Ball did possess a sufficient level of expertise as an accident reconstructionist, neither his report nor his deposition discloses a reliable methodology for his conclusion that the incident "wouldn't have happened," if Mr. Burke had stopped fully at the stop sign. *See Bensenberg v. FCA US LLC*, 31 F.4th 529, 539 n.4 (7th Cir. 2022) ("[T]he court could rightly assume [an expert witness's] qualifications but find his opinion inadmissible on an unrelated ground."). It is well established that "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). Here, Officer Ball's opinion that Mr. Love's death could have been prevented if Mr. Burke had fully stopped at the stop sign does not bear sufficient indicia of reliability. To the contrary, Officer Ball testified that he did not recreate any models of the scene to vet his conclusions, and, although he "took the [tractor's] blind spots into consideration," Officer Ball admitted that he could not identify whether or when Mr. Burke should have spotted Mr. Love as he approached the intersection. Ball Dep. 229:16–230:9, dkt. 195-1; *e.g.*, *id.* at 170:17–20. "While absence of testing represents only one factor in the *Daubert* analysis, when combined with the lack of other supporting data or peer review, it may weigh against a finding of reliability." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 877 (7th Cir. 2021). The Estate has failed to demonstrate that Officer Ball's accident reconstruction/human factors opinions are supported by a reliable methodology. Accordingly, we hold that the Estate, as the proponent of the expert, has failed to carry its burden to establish that Office Ball possesses the necessary expertise and that he utilized sufficiently reliable methods to render opinions admissible as expert testimony, pursuant to Rule 702 of the Federal Rules of Evidence. *See Lewis*, 561 F.3d at 705.

**Fault Codes**: Officer Ball's Report includes his opinion that the tractor's "out-of-service mechanical condition" was a direct cause or material contributing factor to Mr. Love's death. Ball Report 15, dkt. 260-4. He also opines that the tractor suffered from "repeated brake signal, ABS, ESC, and voltage-related errors," which rendered the tractor "an unsafe commercial motor vehicle." *Id.* at 6. Officer Ball's Report states that operating a commercial vehicle bearing "active brake, stability-control, or aftertreatment faults . . . places every nearby road user at risk" because such "defects directly impact stopping distance, steering response, and driver control . . . ." *Id.*

Defendants challenge the admissibility of Officer Ball's fault code testimony on the grounds of his insufficient qualifications and methodology as well as the relevance of such testimony. Officer Ball's deposition testimony revealed that, in his experience as a law enforcement officer, he has issued citations to commercial truck drivers for fault code related violations and has "put trucks out of service." Ball Dep. 29:14–21, dkt. 195-1. Officer Ball has observed other mechanics pull computer data from commercial vehicles, but he has no prior experience doing so himself. *Id.* at 179:22–180:25. During his deposition, Officer Ball also stated that he did not inspect the tractor "from an engineer standpoint," as he himself is not an engineer. *Id.* at 202:22–203:2. He described his role in this litigation as "FMCSA compliance, not engineering," despite his opinion that a mechanical and/or electrical condition of the tractor somehow "[p]layed a factor" in the incident. *Id.* at 242:6–244:8.

That Officer Ball did not personally collect certain data from the tractor in this case does not demonstrate his lack of expertise. To the contrary, "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert . . . ." *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). However, given that Officer Ball repeatedly stated during his

deposition that he is not an expert in engineering or a similarly relevant field, we have little trouble finding that he lacks the necessary expertise to offer an opinion as to whether or how the tractor's fault codes affected the operation of the tractor. Ball Dep. 200:11-17, 247:2-12, dkt. 195-1.

Even if Officer Ball were so qualified, his fault-code opinions would remain inadmissible due to the lack of a reliable methodology to support his conclusions. "[A] proposed expert must bridge the analytical gap by showing a rational connection between the data and the expert's contested conclusion." *Downing v. Abbot Lab'ys*, 48 F.4th 793, 809 (7th Cir. 2022). Here, such rational connection is absent from Officer Ball's proposed testimony. Officer Ball testified that he did not personally inspect the tractor in this case, nor did his review of case materials reveal any forensic evidence to support a theory that the tractor suffered from a brake failure defect. Ball Dep. 170:10–16, 172:21–22, dkt. 195-1. Officer Ball similarly admitted that there is no evidence in this case that a brake system failure, an ABS fault lamp, or an ESC or traction control malfunction existed at the time of the accident. *Id.* at 203:4–15. The tractor did register a single active fault code (SPN 520355), though Officer Ball could not identify "the exact [underlying] condition" since he is "not an engineer." *Id.* at 200:11–17. He testified that the presence of a single active fault code, the underlying cause of which he admittedly could neither identify nor describe, "[p]layed a factor" in the incident and demonstrated the existence of "unanswered questions" as to what factors contributed to the accident. *Id.* at 243:23–245:5. Expert testimony "is admissible only to the extent that it is reasoned, uses the methods of the discipline, and is founded on data." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006). Officer Ball's own deposition testimony reveals the absence of such a reasoned methodology. The Estate has thus failed to establish that Officer Ball's fault code opinions are reasoned and otherwise premised upon accepted methods and data.

A related aspect of Officer Ball's fault code testimony need not be excluded, however. Specifically, Officer Ball opined that existence of past and present fault codes—irrespective of the actual defects they might indicate—rendered the tractor "out-of-service" within the meaning of federal regulations: If the tractor had been taken out of service, as federal regulations apparently require, "Mr. Burke would not have been present in th[e] neighborhood" where the accident occurred. Ball Dep. 246:21–247:8, dkt. 195-1. Daimler contends that such opinion testimony by Officer Ball is legally insufficient to establish causation, thus rendering Officer Ball's proposed testimony both irrelevant and inadmissible. In our view, Daimler's challenges relate primarily to the persuasiveness of Officer Ball's testimony, rather than its admissibility. *Smith*, 215 F.3d at 718–19 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact. . . . The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based."). Accordingly, this aspect of Officer Ball's proposed expert testimony shall not be excluded from our summary judgment analysis.

**The Federal Motor Carrier Safety Regulations**: Officer Ball's Report contains several opinions concerning TruckMovers and Daimler's duties under the FMCSRs. Namely, Officer Ball stated that "Daimler, TruckMovers, and the driver each acted within the scope of regulated commerce and shared responsibility for ensuring the safe condition and lawful operation of this commercial motor vehicle." Ball Report 14, dkt. 260-4. He concluded that TruckMovers and Daimler violated the FMCSRs, which impose nondelegable duties upon motor carriers to oversee their drivers' compliance therewith. *Id.* at 15.

Daimler has moved to exclude these portions of Officer Ball's proposed testimony, arguing that he is not qualified to interpret and opine as to Daimler's compliance (or noncompliance) with the FMCSRs. More specifically, Daimler takes issue with Officer Burke's various assertions that Daimler was subject to and failed to abide by the requirements imposed by the FMCSRs.

"[E]xpert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). "The meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994), *abrogated on other grounds by Kaiser v. Johnson & Johnson*, 947 F.3d 996 (7th Cir. 2020). Thus, to the extent that Officer Ball's proposed testimony seeks to interpret and apply the FMCSRs to Daimler's conduct in this case, such testimony constitutes impermissible legal conclusions that are reserved for the court and the jury. *See, e.g.*, *Kucharski v. Orbis Corp.*, No. 14-cv-05574, 2017 WL 1806581, at *6 (N.D. Ill. May 5, 2017) (excluding proposed expert's opinion concerning applicability of and the defendant's compliance with the FMCSRs); *Gruver v. Montesa Express, Inc.*, No. 1:21-cv-1210, 2024 WL 1913113, at *7 (C.D. Ill. May 1, 2024) (excluding expert testimony as to whether a particular defendant is a motor carrier within the meaning of the FMCSRs). For these reasons, Daimler's motion to exclude Officer Ball's opinions regarding the application of the FMCSRs to its conduct is granted.

In sum, TruckMovers's motion to exclude Officer Ball's proposed testimony is **denied** as to Officer Ball's neutrality and **granted** in all other respects. Dkt. 253. Daimler's motion is **denied** as to the relevance of Officer Ball's opinion about the tractor's out-of-service criteria and **granted** in all other respects. Dkt. 259.

**B. Thomas Corsi [Dkt. 249, 257]**

The Estate also seeks to introduce the expert testimony of Thomas M. Corsi, Ph.D ("Dr. Corsi"), which holds him out to be an expert in interstate logistics and supply chain management; motor carrier safety management policies and practices, and broker/forwarder/third party logistics provider and carrier responsibility in motor carrier selection and retention. Corsi Report 1, dkt. 172-9. Dr. Corsi's professional experience is extensive: A non-exhaustive review of his vita reveals that, since 1976, he has served as Professor of Logistics and Transportation at the University of Maryland. He also serves as an associate editor of the Logistics and Transportation Review as well as senior editor of the Journal of Business Logistics. *Id.* Dr. Corsi has authored more than 125 articles on logistics and transportation and has offered his consulting services to numerous organizations, including the Interstate Commerce Commission and the Federal Motor Carrier Safety Administration. *Id.*

Dr. Corsi's Report identifies six contributing factors to Mr. Love's death: (1) TruckMovers "maintained an ongoing pattern of deficient safety performance," indicating a higher likelihood of TruckMovers's drivers being involved in a fatal collision; (2) TruckMovers failed to follow the FMCSRs when it rehired Mr. Burke, despite Mr. Burke's driving record reflecting multiple infractions; (3) TruckMovers's "deficient hours-of-service monitoring and drug-and-alcohol compliance controls" reflect a "lack of functional compliance systems to detect substance abuse"; (4) Daimler and TruckMovers failed to ensure the tractor's mechanical safety; (5) Daimler maintained a service relationship with TruckMovers despite TruckMovers's poor safety performance record; and (6) Daimler failed to enforce compliance with the FMCSRs despite retaining the operational control necessary to do so. Corsi Report 17–18, dkt. 250-5. These "failures," Dr. Corsi opines, "[e]ach

represented a critical break from established safety management standards within the commercial transportation industry." *Id.* at 18.

In opposing summary judgment, the Estate relies upon Dr. Corsi's Report, which, according to the Estate, "documents a profound, multi-layered collapse of safety systems at TruckMovers." Dkt. 177 at 6. Additionally, the Estate cites Dr. Corsi's conclusions that Daimler retained operational control over the transport of the tractor by way of various provisions in the MSA and Service Specification. Dkt. 172 at 6. Defendants challenge Dr. Corsi's proposed expert testimony in numerous respects, many of which relate to statements that Dr. Corsi made during his deposition, rather than formal conclusions found within his report. TruckMovers and Mr. Burke have jointly moved to preclude Dr. Corsi from testifying on matters of pedestrian behavior, fault codes, and TruckMovers's safety ratings, among other things, arguing that Dr. Corsi is not an expert in the relevant fields and did not utilize reliable methodology to reach his opinions. Dkt. 249. Daimler has also moved to exclude Dr. Corsi's proposed testimony concerning fault codes, the condition of the tractor, and causation on similar grounds. We address Defendants' arguments below.

**Drug Impairment, Pedestrian Behavior, and Yielding the Right-of-way**: During his deposition, Dr. Corsi offered various opinions to which TruckMovers and Mr. Burke now object. Some examples include:

- Dr. Corsi claimed that he is "only offering an opinion that [Mr. Burke] was under the influence of cocaine" as established by Mr. Burke's positive drug test, though he also repeatedly referred to Mr. Burke as having been "high on cocaine." Corsi Dep. 96:11, 99:7–8, 105:20–21, dkt. 258-1 at 24, 25, 27.
- Dr. Corsi opined based on his "personal understanding of how pedestrians operate in today's environment" that "pedestrians on headphones [do not] pay any attention to

what's going on." *Id.* at 122:16–23, dkt. 258-1 at 31; *e.g.*, *id.* at 105:11–106:20, dkt. 258-1 at 27.

- Although Dr. Corsi conceded his lack of familiarity with Indiana's traffic regulations, he testified, "I was taught . . . when I was 8 years old by a lawyer from across the street when he told me that pedestrians always have the right-of-way in crosswalks, so I don't need to cite any specific legislation or law." *Id.* at 107:6–25, dkt. 258-1 at 27.

It is not disputed that Dr. Corsi is highly credentialed in the areas of logistics and transportation. TruckMovers and Mr. Burke argue that Dr. Corsi's expertise in those fields does not, however, translate to matters relating to Mr. Burke's alleged impairment, pedestrian behavior, and traffic regulations. Dkt. 249 at 4–5, 8–11. Given that Dr. Corsi's Report contains no mention of pedestrian behavior and/or local traffic regulations, it is not entirely clear whether Dr. Corsi intends to offer such opinion testimony at trial. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641–42 (7th Cir. 2008). In any event, "[t]he question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (citation modified). Here, the Estate highlights Dr. Corsi's extensive credentials in logistics and transportation but fails to explain how such expertise qualifies him to discuss matters of drug impairment, pedestrian behavior (or a similarly relevant field), and/or traffic laws.

"Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Naeem*, 444 F.3d at 608 (citation modified). The above-quoted portions of Dr. Corsi's deposition make clear that his challenged opinions are not products of his expertise but rather his "[t]alking off the cuff." *Id.* Moreover, Dr. Corsi repeatedly disclaimed any representation that he is a toxicologist, *id.* at 97:9, 98:12, 99:1–2, 125:15–20, dkt. 258-1 at 25, 32. He also noted that he

is not an accident reconstructionist and stated, "[Y]ou can't put me on the witness stand to be in the position of making a determination" as to the allocation of fault between the pedestrian and the driver. *Id.* at 122:2–20, dkt. 258-1 at 31. Insofar as Dr. Corsi seeks to testify as to any opinions which derive solely from his personal experience, rather than his expertise, we find exclusion to be necessary.

**Fault Codes & the Impact of the NOx Sensor Warning Light**: Dr. Corsi's Report includes his opinion that Daimler and TruckMovers failed to "ensure the mechanical safety of the vehicle being transported," as established by a subsequent "diagnostic report reveal[ing] a malfunction indicator light and multiple recorded safety faults." Corsi Report 18, dkt. 250-5. According to Dr. Corsi, "[t]he release of a vehicle with known active defects, without verification of mechanical integrity, created unsafe conditions that increased the likelihood of a catastrophic event." *Id.* (All parties apparently do agree that a malfunction indicator lamp was illuminated on the tractor at the time of the accident.) During his deposition, Dr. Corsi explained that in his opinion Mr. Burke "should not have proceeded . . . to drive the tractor away with the [malfunction indicator lamp] on." Corsi Dep. 88:11–15, dkt. 258-1 at 22. Dr. Corsi readily conceded, however, that he is not an engineer and that he is unfamiliar with the underlying mechanical causes. *Id.* at 33:4–6, 86:20–21, 92:14–25, dkt. 258-1 at 9, 22, 23. Thus, his opinion that Mr. Burke should not have operated the tractor is apparently not based on any code, standard, or regulation but rather his "experience in driving [his] own car." *Id.* at 94:10–95:5, dkt. 258-1 at 24; *e.g.*, *id.* at 87:5–14, dkt. 258-1 at 22.

Given that Dr. Corsi readily conceded that his fault-code related opinions are founded on his personal experience in driving a car, we fail to see any basis for regarding such opinions as the product of his expertise, never mind the result of the application of a reliable methodology. The

Estate attempts to defend Dr. Corsi's opinion testimony by harkening back to his expertise of the FMCSRs and the methodology he indisputably employed in assessing Defendants' adherence thereto. *See* dkt. 290 at 7–10; dkt. 291 at 6–9. To the extent that Dr. Corsi's general qualifications and methodology are unchallenged by Defendants, the Estate's response stops short of addressing how Dr. Corsi's fault-code related opinion flows from his expertise. "Unless the expertise adds something, the expert at best is offering a gratuitous opinion . . . ." *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). Here, Dr. Corsi's fault-code opinions lack a discernable connection to his otherwise uncontested expertise in transportation and logistics and thus amount to inadmissible "gratuitous" opinions.

**Contract Interpretation**: A significant portion of Dr. Corsi's Report details his interpretation of the MSA and Service Specification as evidence of Daimler's operational control over the transportation of the tractor. Corsi Report 14–18, dkt. 250-5. Daimler challenges such testimony as unreliable since Dr. Corsi allegedly misquoted the text of the operative agreements. Dkt. 257 at 7. To the extent that Dr. Corsi's conclusions are drawn from a plain misreading of the MSA and/or Service Specification, such issues go to the *credibility* of Dr. Corsi's testimony, rather than its admissibility. *See Smith*, 215 F.3d at 718–19.

That said, "[a]rgument about the meaning of . . . contracts . . . belongs in briefs, not in 'expert' reports." *RLJCS Enters., Inc. v. Pro. Ben. Tr. Multiple Emp. Welfare Ben. Plan & Tr.*, 487 F.3d 494, 498 (7th Cir. 2007). "The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony." *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969). Thus, to the extent that Dr. Corsi's observations about the meaning of the MSA and/or Service Specification do not warrant exclusion on the grounds raised by Daimler, their usefulness and ultimate relevance appear tenuous, at best.

**<u>Remaining Portions of Dr. Corsi's Proposed Testimony</u>**: TruckMovers and Mr. Burke's remaining challenges to Dr. Corsi's proposed expert testimony relate to his reliance upon SaferWatch data to form his opinions; his review of (disputed) evidence of hours-of-service violations; his view that Mr. Burke failed to complete a pre-trip inspection; and his opinions about Mr. Burke's qualifications and TruckMovers's hiring practices.

Regarding Dr. Corsi's reliance upon data from a third-party resource, SaferWatch, TruckMovers and Mr. Burke contend that Dr. Corsi "failed to provide any of the data in an admissible format . . . ." Dkt. 249 at 11. Under Federal Rule of Evidence 703, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. To that end, it is unclear to us how Dr. Corsi's failure to provide data "in an admissible format" renders his testimony inadmissible. Dkt. 249 at 11. At bottom, TruckMovers and Mr. Burke's objections to the underlying factual bases of Dr. Corsi's opinions are subjects for cross-examination, rather than grounds to exclude his testimony entirely. *See Smith*, 215 F.3d at 718–19.

**C. Michael Suls [Dkt. 255]**

Dr. Suls is the Medical Review Officer who reviewed the results of Mr. Burke's post-accident drug test. The Estate has designated Dr. Suls as a non-retained expert witness who will testify about the results of Mr. Burke's post-accident drug test as well as the general side effects of cocaine usage. During his deposition, Dr. Suls explained the limitations of his analysis, noting that the drug test itself did not reveal the precise time or quantity of Mr. Burke's cocaine usage. Suls Dep. 24:1–9, dkt. 256-2 at 3. Based on Dr. Suls's unchallenged medical expertise, he explained the common side effects of cocaine generally but did not opine as to Mr. Burke specifically, since he lacked

sufficient information about Mr. Burke's cocaine consumption to render such opinions. *See id.* at 28:1–17, dkt. 285-1 at 15.

Defendants jointly move to exclude Dr. Suls's proposed testimony as unhelpful to the jury and as unreliable. (Notably, TruckMovers and Mr. Burke challenge portions of Dr. Suls's testimony, which they themselves have cited and relied upon in support of their motion for summary judgment. Dkt. 142 at 5–6; dkt. 256 at 3–4.) None of Defendants' arguments are availing, however.

Dr. Suls's expertise in toxicology is unrefuted. Defendants nonetheless argue that his testimony would not help the trier of fact because Mr. Burke's post-accident drug test "is not evidence that [he] was impaired at the time of the [i]ncident, and whether [Mr.] Burke was impaired is not a fact issue for a jury to decide." Dkt. 256 at 3. Defendants also contend that Dr. Suls should be precluded from opining whether Mr. Burke was impaired at the time of the accident because any such testimony would amount to impermissible speculation, rather than a sound expert opinion.

Whether and to what extent Mr. Burke's alleged cocaine usage impaired his ability to operate a commercial motor vehicle and proximately caused the accident are central to the Estate's theory of the case. Dr. Suls's proposed testimony bears directly on this dispute. As a toxicologist and medical review officer, Dr. Suls is fully qualified to testify about how cocaine impacts the human body. True, as Defendants emphasize, Dr. Suls candidly conceded during his deposition that he could not render a conclusive opinion as to whether, when, or to what degree Mr. Burke experienced the intoxicating effects of cocaine. *See* Suls Dep. 24:1–25:9, dkt. 142-10 at 4–5. The admitted limitations of Dr. Suls's testimony, in our view, bear on its persuasive value, rather than its admissibility. Contrary to Defendants' assertion, "[t]he degree of intoxication is a question of fact to be decided by the jury." *Dziepak v. State*, 483 N.E.2d 449, 453 (Ind. 1985). *See also Clinton G. Cauldwell, Inc. v. Patterson*, 133 Ind. App. 138, 169–70 (1961) (Where there is conflicting

evidence of a person's intoxication, "it is the jury's duty and not the duty of the court to weigh the evidence to determine which evidence is acceptable.); *accord Shores v. Dupps Co., Inc.*, No. 4:18-cv-04147-JEH, 2020 WL 6302362, at *7 (C.D. Ill. Sept. 14, 2020) (Illinois law). The inconclusive nature of Dr. Suls's testimony may indeed require the jury to draw (reasonable) inferences in order to resolve the disputed status of Mr. Burke's impairment. In this case, Dr. Suls's testimony will assist the trier of fact in assessing whether and/or how Mr. Burke's deviations from the standard of care proximately caused Mr. Love's death. For these reasons, Defendants' joint motion to exclude Dr. Suls's shall be **denied**.

### D. The Estate's Motions to Exclude Defendants' Expert Witnesses [Dkt. 266–68, 271] & Defendants' Motions to Strike [Dkt. 272, 275]

On January 15, 2026, the Magistrate Judge extended the parties' deadline for filing motions to limit or preclude expert testimony through February 20, 2026. Dkt. 232. Notwithstanding that clear and unequivocal court-imposed deadline, the Estate belatedly filed three motions to exclude on February 23, 2026, dkt. 266–68, as well as a fourth motion to exclude on February 24, 2026, dkt. 271. The Estate's untimely submissions prompted Defendants' ensuing motions to strike, which were filed on February 25, 2026. Dkt. 272, 275. On February 26, 2026—that is, *after* the Estate submitted its untimely motions and *after* Defendants responded with motions to strike—the Estate sought leave to file its various motions to exclude, asserting that the operative case management plan permitted the parties to file their expert motions "no later than 120 days prior to" trial, which, according to the Estate's calculations, meant that the deadline was February 23, 2026. Dkt. 277 at 1. On March 12, 2026, the Magistrate Judge soundly rejected the Estate's contentions as "misplaced" and denied the Estate's motion for leave as such. Dkt. 301. The Estate's untimely motions to exclude and Defendants' motions to strike remain pending. Dkt. 266–68, 271–72, 275.

The disposition of Defendants' motions to strike is not difficult. The deadline to challenge Defendants' expert witnesses was February 20, 2026. The Estate's theory as to the timeliness of its motions is not persuasive, particularly where, as here, the Magistrate Judge soundly rejected such argumentation as "misplaced." Defendants' Joint Motion to Strike, dkt. 272, and Daimler's Motion to Strike, dkt. 275, shall be **granted**, and the Estate's Motions to Exclude, dkt. 266–68, 271, shall be **stricken** accordingly.

## II. Negligence

"The tort of negligence consists of three elements: (1) a duty to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) injury to the plaintiff proximately caused by that breach." *Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005). "In negligence cases, summary judgment is rarely appropriate," since the legal issues "are particularly fact sensitive and are governed by a standard of the objective reasonable person—one best applied by a jury after hearing all of the evidence." *Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004) (citation modified). "Where a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, a court should not adopt that party's version of the facts for the purpose of ruling on a motion for summary judgment." *McCottrell v. White*, 933 F.3d 651, 661 (7th Cir. 2019) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).

In this case, the Estate contends that Mr. Burke, whose post-accident drug test was positive for cocaine, negligently operated a multi-axle tractor—which itself allegedly suffered from several mechanical failures—in a residential district by rolling through a stop sign and entering an intersection to execute a left turn without maintaining a proper lookout for potential hazards, including pedestrians. Dkt. 177 at 5–6; dkt. 172 at 1. Mr. Burke's lack of awareness contributed to the

accident, according to the Estate, because he failed to appreciate that Mr. Love had made contact with the tractor and instead continued to make an unsafe left turn that crushed Mr. Love beneath the rear wheels. *Id.* Altogether, the Estate argues, Mr. Burke's conduct fell short of the standards of care imposed upon him by federal motor carrier regulations as well as Indiana law. *Id.*

Defendants rejoin that the surveillance footage conclusively disproves the Estate's arguments concerning Mr. Burke's impairment and the tractor's alleged mechanical issues; and proves that Mr. Love himself caused the accident because he, who was under the influence of alcohol and marijuana, stepped onto the roadway while actively engaged with his cell phone and walked directly into the tractor's rear wheels. Dkt. 142 at 2; dkt. 148 at 2. In moving for summary judgment, TruckMovers and Mr. Burke do not challenge duty and breach. Daimler, however, contends that it owed no duty to Mr. Love and thus cannot be held liable either vicariously or directly. All Defendants also argue that none caused Mr. Love's death; or, in the alternative, that no reasonable jury could find Mr. Love less than fifty percent responsible, thereby precluding the Estate's recovery under Indiana's Comparative Fault Act. Defendants also assert that the Estate has adduced no evidence that minors C.W., K.L., and T.L. were Mr. Love's dependent children, as is required to recover under Indiana's General Wrongful Death Statute; and that the Estate is precluded by Indiana law from recovering an award of damages for pain and suffering, mental anguish, and physical impairment.

Below, we first address Daimler's arguments with regard to its legal duty before turning to the parties' remaining contentions about causation, contributory fault, and recovery under the General Wrongful Death Statute.

**A. Daimler's Duty**

The Estate seeks to hold Daimler vicariously and directly liable for Mr. Love's death. Daimler argues that: (1) it cannot be held legally responsible for the conduct of its wholly owned subsidiary, DTR; (2) Mr. Burke was an independent contractor for whom Daimler is not vicariously liable; (3) the FMCSRs do not supply a basis on which Daimler can be held liable for Mr. Burke's conduct; (4) the Estate has failed to adduce evidence sufficient to establish a joint enterprise among Defendants; and (5) the Estate has adduced no evidence of mechanical fault on the basis of which to hold Daimler directly liable.

At the outset, we note that the Estate's surreply brief significantly supplements and refines its legal arguments against Daimler in a manner that is incompatible with our summary judgment procedure. For example, Daimler's opening brief explicitly argued that no exception to Indiana's non-liability rule for independent contractors applies to the facts at bar and that the record evidence belies the Estate's joint enterprise theory. Dkt. 148 at 12–14, 19. The Estate's response brief does not address any of these arguments, meaning that the Estate has effectively conceded these points. *Ratcliff v. TranStewart Trucking Inc.*, 684 F. Supp. 3d 845, 866 (S.D. Ind. 2023) (treating plaintiffs' failure to respond to arguments concerning vicarious liability under common law and the FMCSR as waiver); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver," and "silence leaves us to conclude" a concession.). To the extent that the Estate's surreply brief articulates responsive arguments that could (and should) have been included in its initial response brief, such belated arguments are incompatible with our summary judgment rules and we therefore decline to consider them.

*1. Daimler's Responsibility for DTR's Conduct*

Daimler Truck North America, whom we refer to as "Daimler" throughout this order, is the only Daimler-entity named as a defendant in this litigation. It is undisputed that Daimler purchased the tractor on September 6, 2023, and that Daimler owned the tractor at the time of the accident. Dkt. 150-3 at 2. The MSA and the Service Specification reveal that Daimler Truck Remarketing Corporation (Daimler's wholly owned subsidiary) engaged TruckMovers to transport the tractor. *See generally* MSA 1, dkt. 150-6 at 2; Service Specification 1, dkt. 172-3. Notably, the Estate did attempt to add DTR to this litigation in September 2025 via its third motion for leave to amend, which the Magistrate Judge denied on October 30, 2025, in part because the expiration of the statute of limitations period rendered the Estate's proposed amendments futile. Dkt. 138 at 3–4.

Notwithstanding DTR's absence from this litigation, the Estate seeks to hold Daimler liable on the grounds that Daimler allegedly retained "operational control" over the transportation of the tractor. Dkt. 172 at 2. The Estate also asserts that Daimler was negligent in its carrier oversight and that Daimler improperly entrusted a vehicle "with known safety-critical defects." *Id.* Daimler contends that the Estate's position is misplaced because Daimler cannot be held liable for the conduct of DTR, its wholly owned subsidiary.

A "time-honored principle" of American corporate law holds "that a parent corporation . . . is not liable for the acts of its subsidiaries." *Apogee Coal Co. v. Off. of Workers' Comp. Programs*, 113 F.4th 751, 760 (7th Cir. 2024) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)). Under Indiana law, a parent corporation is generally not liable for the acts of its subsidiaries because they are "separate legal entities." *McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016, 1020 (Ind. 1995).

A straightforward application of these well-established legal principles leads to the conclusion that Daimler cannot be held liable for DTR's conduct. The Estate, for its part, offers no responsive argument to the contrary: Indeed, the Estate's response brief acknowledges neither DTR's absence from this litigation nor the fact that Daimler and DTR are distinct entities. *See generally* dkt. 172. To the contrary, the Estate repeatedly cites the MSA and Service Specification as if DTR's participation in the driveaway-towaway program equally evinces the myriad ways in which *Daimler* retained and exercised significant control and oversight over the transportation arrangements with TruckMovers. The Estate's contentions do not survive scrutiny because DTR—*not* Daimler—is the only Daimler party to the MSA and Service Specification. Given that Daimler was indisputably not a party to either the MSA or the Service Specification, the Estate's theory that Daimler's alleged contractual relationship with TruckMovers establishes Daimler's extensive involvement in the underlying facts necessarily falls flat for lack of evidentiary support. *See* dkt. 172 at 11–12. Although we are inclined to conclude that the Estate's failure in identifying the correct party is dispositive of the question of Daimler's liability in this case, we shall, in the interest of completeness, address the arguments as raised and fully briefed by the parties.

*2. Daimler's Vicarious Liability under Indiana Common Law*

Vicarious liability allows courts to "hold a party legally responsible for the negligence of another, not because the party did anything wrong but rather because of the party's relationship to the wrongdoer." *Sword v. NKC Hosps., Inc.*, 714 N.E.2d 142, 147 (Ind. 1999). "A principal who controls or has the right to control the physical conduct of his agent in the performance of a service is a master, upon whom liability for the torts of the agent may be imposed." *Detrick v. Midwest Pipe & Steel, Inc.*, 598 N.E.2d 1074, 1077 (Ind. Ct. App. 1992). "Respondeat superior is the doctrine most often associated with vicarious liability in the tort context. It relies on an employer-

employee or principal-agent relationship and generally does not apply to independent contractors." *Arrendale v. Am. Imaging & MRI, LLC*, 183 N.E.3d 1064, 1068 (Ind. 2022).

"Whether one employed to perform a task acts as an independent contractor or a servant is generally a question of fact," though "where the relevant facts are undisputed, the court will determine whether the employer has the right to control the alleged employee . . . ." *Detrick*, 598 N.E.2d at 1077. In order to determine whether vicarious liability is available pursuant to an employment relationship, Indiana courts employ a multifactor test assessing (i) the extent of the principal's control over the details of the individual's work; (ii) whether the individual is engaged in a distinct occupation; (iii) whether the occupation is typically done under supervision; (iv) the skill required for the occupation; (v) whether the principal supplies the instrumentalities, tools, and place of work; (vi) the length of employment; (vii) the method of payment; (viii) whether the work is a part of the principal's regular business; (ix) whether the parties believe they are creating an employer-employee relationship; and (x) whether the principal is in business. *Moberly v. Day*, 757 N.E.2d 1007, 1010 (Ind. 2001). The primary considerations in determining the existence of an employer-employee relationship are whether "the employer has the right to direct and control the activities of the alleged employee" and whether the parties share "a mutual belief that an employer-employee relationship exists." *Kahrs v. Conley*, 729 N.E.2d 191, 194 (Ind. Ct. App. 2000).

In this case, the Estate argues that Daimler's alleged operational control evinces an employer relationship with TruckMovers, meaning that Daimler can be held vicariously liable for Mr. Burke's negligence. Daimler argues that it is not vicariously liable for Mr. Burke's conduct because neither Daimler nor DTR was Mr. Burke's employer. Our review of the undisputed record evidence leads us to conclude that no reasonable jury could find that Mr. Burke was Daimler's employee, thereby foreclosing the Estate's respondeat superior theory against Daimler.

"An employee is one employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *Carroll v. Kamps*, 795 F. Supp. 2d 794, 807 (N.D. Ind. 2011) (applying *Moberly* factors). "When an individual is answerable to another for results only, rather than for the particulars of how the assigned task is accomplished, this factor weighs in favor of the individual's having independent contractor status." *Snell v. C.J. Jenkins Enters., Inc.*, 881 N.E.2d 1088, 1092 (Ind. Ct. App. 2008).

In this case, the MSA delegated to TruckMovers the "sole and exclusive care, custody, and control of all vehicles from the time of tender by [DTR to TruckMovers] for transportation until delivery to cosignee." MSA 4, dkt. 150-6 at 5. Mr. Bross testified consistently with this delegation provision, stating that, once TruckMovers took possession of Daimler's vehicle, TruckMovers was "responsible for that truck and responsible for [the] driver. [TruckMovers] put the driver in the truck. Daimler doesn't have anything to do with it." Bross Dep. 28:14–18, dkt. 150-4 at 6. Additionally, TruckMovers managed all aspects of truck movement, including, *inter alia*, the routes, drivers, and scheduling. *Id.* at 124:16–127:20, dkt. 150-4 at 9–10.

The Estate argues that the MSA and Service Specification demonstrate the ways in which Daimler retained control over the details of TruckMovers's vehicle transportation. The Estate alleges generally that TruckMovers was required to abide by Daimler's "proprietary operational manuals governing the handling, movement, and delivery of [its] tractors." Dkt. 172 at 11. To support its contention that Daimler prescribed TruckMovers's "exact methods, procedures, and safety protocols," the Estate highlights that the Service Specification required TruckMovers to utilize a DTR-specific communication service to transmit pickup information, estimated arrival times, delivery confirmations, and notices of unexpected delays and/or deviations. Service Specification 2, dkt.

172-3. The Estate also contends that Daimler dictated delivery timing and location, controlled data integrity thresholds, enforced key performance metrics, and retained the unilateral authority to terminate its contract(s) with TruckMovers.

The Estate relies almost exclusively upon the ways in which the MSA and Service Specification allegedly evince Daimler's authority over TruckMovers's work. Unexplained by the Estate, however, is how either agreement—to which *Daimler is not a party*—plausibly reveals the ways in which Daimler exercised control over the tractor's transportation. The Estate does not elaborate in its response brief regarding whether or how DTR's alleged control supports in the imposition of liability upon Daimler. Similarly, the Estate's focus on how Daimler allegedly controlled aspects of TruckMovers's contractual performance stops short of illuminating how Daimler controlled the nature of Mr. Burke's work.

In any event, the instant record does not support the conclusion that Daimler controlled the particulars of Mr. Burke's work. Indiana law is well established that "[i]t is not enough that [the principal] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations or deviations." *Pelak v. Indiana Indus. Servs., Inc.*, 831 N.E.2d 765, 770 (Ind. Ct. App. 2005) (quoting Restatement (Second) of Torts § 414, cmt. c (1965)). Likewise, "several courts have held that setting a work schedule or requiring an individual to be at a given place at a given time are not, by themselves, sufficient to establish an employer-employee relationship." *Carroll*, 795 F. Supp. 2d at 807 (citations omitted).

These legal principles, which the Estate does not contest, establish that no reasonable jury could find that Daimler or DTR exercised control over the manner and means of Mr. Burke's work-related activities. The Estate does not provide (beyond a vague reference to DTR's "proprietary

operational manuals") any indication of concrete ways in which DTR directed specific aspects of Mr. Burke's driving. Nor does the mere existence of DTR-specific rules and standards establish an employment relationship. To the contrary, Indiana law holds that "[t]he fact that the work is to be done under the direction and to the satisfaction of certain persons representing the employer[ ] does not render the person contracted with to do the work a servant." *Jones v. Indianapolis Power & Light Co.*, 158 Ind. App. 676, 684 (1973).

The Estate relies upon the 1992 decision in *Detrick v. Midwest Pipe & Steel, Inc.* by the Indiana Court of Appeals to establish that an employer-employee relationship existed between Daimler and TruckMovers. 598 N.E.2d at 1076. *Detrick* involved a fatal collision between an automobile and a semi tractor-trailer. *Id.* The automobile driver's estate brought a wrongful death action against the trucking company, the truck driver, and the shipper. *Id.* The trial court entered summary judgment in favor of the shipper on the grounds that the truck driver was an independent contractor, rather than an employee. *Id.* at 1076–77. The appellate court reversed, holding that material factual disputes precluded resolution of the independent contractor determination. *Id.* at 1078. In *Detrick*, the record contained conflicting evidence which might have allowed a jury to find that the shipper had the power to hire and fire drivers directly; that the drivers regarded themselves as employees of the shipper; and that the drivers regularly performed non-driving tasks for the shipper. *Id.* at 1077–78.

The Estate's reliance on *Detrick* in the context of this case is misplaced. As discussed above, the record before us is bereft of evidence indicating that Daimler exercised control over Mr. Burke, never mind that Daimler directly hired or communicated with Mr. Burke. Burke Dep. 20:21–21:8, dkt. 195-7 at 4–5. That DTR retained the authority to unilaterally terminate its contract with TruckMovers does not constitute evidence of Daimler's authority to terminate Mr. Burke's employment.

*See Kahrs*, 729 N.E.2d at 194–95. At bottom, the evidence establishes that Daimler's primary interest was in results only—that is, the transportation of its vehicles from one location to another. Under these circumstances, no reasonable jury could conclude that Mr. Burke was Daimler's employee.

The long-standing rule in Indiana is that "a principal is not liable for the negligence of an independent contractor," though Indiana courts have recognized five exceptions. *Id.* at 195 (citation omitted). Although Indiana law does not recognize a standalone cause of action for negligent selection, "an employer of an independent contractor may be subject to liability for personal injuries caused by the employer's failure to exercise reasonable care to employ a competent and careful contractor when" an exception to the rule of non-liability applies. *Bagley v. Insight Commc'ns Co., L.P.*, 658 N.E.2d 584, 587 (Ind. 1995).

In this litigation, the Estate has averred that Daimler is liable for negligently selecting TruckMovers and/or Mr. Burke; however, its response brief entirely fails to rebut Daimler's opening argument that no exception to Indiana's rule of non-liability for independent contractors applies to the facts of this case. *See* dkt. 172 at 15. The Estate's failure to respond to Daimler's legal arguments constitutes a waiver. *Bonte*, 624 F.3d at 466. Daimler's motion for summary judgment thus shall be **granted** as to the independent contractor determination as well as negligent selection.

*3. Vicarious Liability under the Federal Motor Carrier Safety Regulations*

The Federal Motor Carrier Safety Regulations "eliminate the distinction between independent contractors and employees so that an attempt by motor carriers to avoid liability simply by labeling a driver as an independent contractor is unavailing." *Ill. Bulk Carrier, Inc. v. Jackson*, 908 N.E.2d 248, 255 (Ind. Ct. App. 2009); *see* 49 C.F.R. § 390.5 (defining "employees" to include independent contractors). Thus, Indiana's rule of non-liability for independent contractors

notwithstanding, "an interstate motor carrier can be held vicariously liable for the negligence of an independent contractor pursuant to the FMCSR[s] under certain circumstances." *Jackson*, 908 N.E.2d at 254.

Here, the Estate alleges that Daimler is vicariously liable for Mr. Burke's actions due to its status as a motor carrier. Daimler disclaims its role as a motor carrier, arguing instead that its participation in the underlying facts was more akin to that of a shipper. Again, the Estate's response omits any responsive argument, though its surreply brief (belatedly) includes an assertion that Daimler "owned the [tractor] at the time of the incident, used DTR to dictate the parameters under which it was transported, and coordinated the movement of the vehicle through DTR in conjunction with TruckMovers." Dkt. 199 at 14. The Estate's theory is that Daimler, "acting alongside its agent DTR, was plainly functioning as a private motor carrier by helping arrange and controlling the transportation of trucks it owned to dealers for resale and for [Daimler's] direct economic benefit." *Id.* at 15.[8]

In determining whether the FMCSRs apply to Daimler in this case, "the crucial inquiry is in what capacity [Daimler] was acting during the [underlying] transaction." *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 507 (7th Cir. 2009) (affirming summary judgment where logistic services provider acted as a broker, rather than a motor carrier, and thus was not liable for negligence under the FMCSRs). A "motor carrier" is defined as "a for-hire motor carrier or a private motor carrier." 49 C.F.R. § 390.5. A private motor carrier is "a person who provides transportation of property or passengers, by commercial motor vehicle, and is not a for-hire motor carrier." *Id.* A shipper, by

[8] The Estate's surreply brief makes only passing references to "agents" and "agency" but does not develop any argument as to an agency theory of liability.

contrast, "means a person who tenders property to a motor carrier or driver of a commercial motor vehicle for transportation in interstate commerce . . . ." 49 C.F.R. § 390.5.

The undisputed material facts leave no doubt that Daimler's conduct during the underlying transaction more closely aligned with that of a shipper than a motor carrier. Consider the following evidence: although Daimler, a federally licensed motor carrier, owned the tractor at issue in this litigation, DTR (a non-party entity) contracted with TruckMovers (a licensed motor carrier) to transport the tractor. TruckMovers, in turn, hired Mr. Burke (a commercial driver) to transport Daimler's tractor from Wisconsin to Texas. The MSA between DTR and TruckMovers clearly provides that TruckMovers "shall have sole and exclusive care, custody, and control of all vehicles from the time of tender by [DTR] or [DTR's] Agent to [TruckMovers] for transportation until delivery to consignee." MSA 4, dkt. 172-2.

"[T]he fact that [Daimler] *possessed* a motor carrier license is not determinative of" whether it *operated* as a motor carrier in the underlying facts and is therefore subject to the FMCSRs. *Camp*, 553 F.3d at 507 (emphasis added). "For vicarious liability under the FMCSR[s] to attach to a motor carrier, that motor carrier must have been in control or possession of the motor vehicle at issue." *Ratcliff*, 684 F. Supp. 3d at 867 (citing *Jackson* 908 N.E.2d at 255). That is, "[o]nly if [Daimler] was functioning as 'a person engaged in the transportation of goods or passengers for compensation' " does the Estate's theory hold any water. *Camp*, 553 F.3d at 507 (quoting 49 C.F.R. § 390.5). The Estate contends that Daimler retained control over the operation and transportation of the tractor through the MSA and Service Specification. However, as detailed above, Daimler was not a party to either agreement, and the Estate does not explain how DTR's alleged conduct can be imputed to Daimler. Having adduced no further evidence and having otherwise failed to respond to Daimler's argument that it played no role in the transportation, the Estate has

failed to show that a material factual dispute exists as to whether Daimler acted as a motor carrier, which can be tagged with vicarious liability for Mr. Burke's conduct. Accordingly, Daimler's motion for summary judgment shall be **granted** with regard to any liability under the FMCSRs.

*4. Joint Enterprise Liability*

In motor vehicle cases such as the one at bar, joint enterprise liability requires the proponent to show (1) joint control over the management and operation of the vehicle as well as over the course and conduct of the trip; (2) an equal right to direct and govern the movement and conduct of each other; (3) a community of interest in the object and purpose of the undertaking that is pecuniary in nature; and (4) an express or implied agreement. *Benson v. Sorrell*, 627 N.E.2d 866, 868–69 (Ind. Ct. App. 1994).

Daimler (as well as TruckMovers and Mr. Burke) have moved for summary judgment on the Estate's joint enterprise theory of liability. Dkt. 148 at 19; dkt. 142 at 27–29. The Estate's response brief in opposition of Daimler's motion for summary judgment fails entirely to respond to Daimler's joint enterprise argument, *see generally* dkt. 172, though its response to TruckMovers and Mr. Burke's summary judgment motion contends that the joint enterprise inquiry requires resolution by a jury, dkt. 177 at 11.

We can make quick work of the Estate's joint enterprise argument, since this theory remains largely underdeveloped by the Estate. Because the Estate has failed to respond to Daimler's contention that no joint enterprise existed by which TruckMovers's and/or Mr. Burke's negligence could be imputed to Daimler, the Estate has waived any argument to the contrary. *Wojtas v. Cap. Guardian Tr. Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (The plaintiff's "failure to offer any opposition to [the defendant's] . . . argument constituted a waiver.").

To the extent that the Estate's response to TruckMovers and Mr. Burke's joint enterprise argument might be construed as applicable with equal force to Daimler, summary judgment nonetheless remains appropriate for Defendants. The gist of the Estate's argument is that Daimler, TruckMovers, and Mr. Burke all shared a pecuniary interest in coordinating their transportation efforts efficiently (and profitably) and that accordingly each contributed to the timely transportation of Daimler's tractor(s). Dkt. 177 at 11. Whatever the merits of such a theory might be, however, the Estate's failure to designate any record evidence and/or to cite any legal authority supporting the legal conclusion they urge upon us is dispositive in our resolution of Defendants' motions for summary judgment. It is well-established that district courts "are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003). Because the Estate has failed to designate specific facts showing that there is a genuine issue for trial, Defendants are entitled to summary judgment on the question of joint enterprise liability, and their motions shall be **granted** accordingly. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

*5. Daimler's Independent Liability for the Tractor's Mechanical Condition*

The Estate's remaining contentions relate to Daimler's alleged failures to complete an inspection of the tractor, to inform TruckMovers of the tractor's known diagnostic needs, and to retrofit the tractor with its hazard detection technology, Side Guard Assist. Since Daimler does not contest these negligent maintenance and/or mechanical fault theories with regard to its legal duties, we address these issues in our discussion of proximate causation below.

**B. Proximate Causation**

"Under Indiana negligence law, there must be a 'reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered.' " *Spinnenweber v. Laducer*, 983 F.3d

301, 304 (7th Cir. 2020) (quoting *Topp*, 838 N.E.2d at 1032). That is, there must be a "causal connection between the negligence and the hurt." *Peters v. Forster*, 804 N.E.2d 736, 739 (Ind. 2004) (citation omitted). "The injurious act must be both the proximate cause and the cause in fact of the injury." *Bazeley v. Price*, 14 N.E.3d 127, 131 (Ind. Ct. App. 2014).

"A negligent act is the proximate cause of an injury if the injury is a natural and probable consequence, which in light of the circumstances, should have been foreseen or anticipated." *Humphery v. Duke Energy Indiana, Inc.*, 916 N.E.2d 287, 290 (Ind. Ct. App. 2009) (internal citation omitted). "The negligent act must set in motion the chain of circumstances which contribute to or cause the resulting injury." *Carter v. Indianapolis Power & Light Co.*, 837 N.E.2d 509, 520 (Ind. Ct. App. 2005). "When assessing foreseeability in the context of proximate cause, courts 'evaluate the particular circumstances of an incident after the incident occurs.' " *Scott v. Retz*, 916 N.E.2d 252, 257–58 (Ind. Ct. App. 2009) (quoting *Goldsberry v. Grubbs,* 672 N.E.2d 475, 479 (Ind. Ct. App. 1996), *trans. denied.*) (citation modified). Typically, proximate cause is a factual question delegated to the trier of fact, though courts may resolve such questions as a matter of law if "only a single conclusion can be drawn from the facts." *Hamilton v. Ashton*, 846 N.E.2d 309, 316 (Ind. Ct. App.), *decision clarified on reh'g,* 850 N.E.2d 466 (Ind. Ct. App. 2006).

In moving for summary judgment, TruckMovers argues that Mr. Love's actions were an intervening cause that broke the causal chain, thus absolving it (and Mr. Burke) of liability. Dkt. 142 at 8. Under Indiana law, a "chain of causation may be broken if an independent agency intervenes between the defendant's negligence and the resulting injury." *Carter*, 837 N.E.2d at 520. As explained by the Indiana Court of Appeals:

> The key to determining whether an intervening agency has broken the original chain of causation is to decide whether, under the circumstances, it was reasonably foreseeable that the agency would intervene in such a way as to cause the resulting injury. If the intervening cause was not reasonably foreseeable, the

> original negligent actor is relieved of any and all liability resulting from the original negligent act.

*Id.* at 520–21; *e.g.*, *Scott*, 916 N.E.2d at 257 (describing intervening agency as "the doctrine of superseding causation").

"A superseding cause is something culpable that intervenes between the defendant's negligence and the plaintiff's injury, some action of a *third party* that makes the plaintiff's injury an unforeseeable consequence of the defendant's negligence." *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002) (emphasis added) (Oklahoma law). Mr. Love is not a third party to his own injury; thus, we doubt that TruckMovers's superseding cause argument is the most analytically sound or otherwise particularly helpful framework for evaluating the facts of this case. *See Abbas v. Neter-Nu*, 261 N.E.3d 233, 246 (Ind. 2025). In any event, "[c]ausation limits a negligent actor's liability to foreseeable consequences," and "[a] superseding cause is, by definition, one that is not reasonably foreseeable." *Control Techniques, Inc. v. Johnson*, 762 N.E.2d 104, 108 (Ind. 2002). Since the crux of TruckMovers's arguments is that Mr. Love's death was not a foreseeable consequence of Mr. Burke's negligence, we shall bypass any potential confusion generated by what would likely be an unnecessary analysis of superseding causation.

The Estate avers numerous ways in which Daimler's, TruckMovers's, and Mr. Burke's negligence allegedly caused Mr. Love's death. As discussed above, many of the Estate's theories against Daimler fail as a matter of law because the Estate has failed to establish that Daimler can be held liable for Mr. Burke's conduct. The Estate's remaining theory of Daimler's direct negligence concerns the allegedly defective condition of the tractor and Daimler's purported negligent maintenance thereof. Regarding TruckMovers, the Estate argues that TruckMovers negligently hired Mr. Burke. Below, we address the Estate's mechanical defect theory apropos of Daimler and

TruckMovers before we turn to the Estate's negligent hiring claim against TruckMovers and the remaining arguments concerning Mr. Burke's alleged negligence.

*1. Defective Condition of the Tractor*

The Estate maintains that Daimler negligently failed to inspect the tractor before transferring possession to TruckMovers and failed to inform TruckMovers of the tractor's diagnostic needs. Dkt. 172 at 15–17. Continuing, the Estate argues that a "malfunction indicator light, which signaled multiple system faults, combined with the absence of any documented pre-trip inspection and the lack of diagnostic review" would allow a jury to find that the tractor itself suffered from a "delayed throttle response, steering issues, braking irregularities, or other mechanical defects that impeded [Mr.] Burke's ability to avoid the collision." Dkt. 177 at 9. Our review of this evidence prompts us to conclude that no reasonable jury could find that any purported mechanical defect with the tractor caused or contributed to Mr. Love's death.

We need look no further than the Estate's response briefs, dkt. 172 at 4–6, 13; dkt. 177 at 6, 9, which entirely fail to support the Estate's sweeping allegations of Daimler's purported negligent maintenance and/or of mechanical errors having affected the operation of the tractor with citations to the specific portions of the record, as required by both the Federal Rules of Civil Procedure and our Local Rules. Fed. R. Civ. P. 56(c); S.D. Ind. L.R. 56-1(e). For example, the Estate repeatedly refers to the absence of a "pre-trip inspection" but fails to substantiate such evidentiary assertion with citations to the record evidence. Dkt. 177 at 6, 7, 9; *see* dkt. 172 at 7, 9. (Generic citations to exhibits, without "refer[ring] to a page or paragraph number" or the like, does not suffice. S.D. Ind. L.R. 56-1(e).) Even viewing the record in the light most favorable to the Estate, including our consideration of the Estate's proposed expert witnesses testimony, the negligent maintenance and defective condition theories do not pass muster.

The record evidence adduced by the parties establishes that, at the time of the accident, the tractor's malfunction indicator lamp ("MIL") was illuminated. Ball Dep. 201:24–202:6, dkt. 195-1. Subsequent diagnostic testing revealed that the MIL arose from a single fault code, SPN 520355-21,[9] which all parties' proposed experts agree (or at the very least do not dispute) relates to the aftertreatment control module that regulates emissions. Ball Dep. 181:21–182:11, 185:13–16, dkt. 195-1; Corsi Dep. 92:17–19, 99:9–22, dkt. 258-1 at 23, 25. The Estate's designated experts, Officer Ball and Dr. Corsi, explicitly testified that neither could identify whether or how the aftertreatment control module caused or contributed to the accident. Ball Dep. 244:24–245:5, dkt. 195-1; Corsi Dep. 95:6–19, dkt. 258-1 at 24. (Although the Estate identifies a whole slew of prior, inactive fault codes that cropped up in the tractor's history, the Estate has adduced no admissible evidence illuminating whether or how the tractor's *inactive* fault codes constituted a mechanical error that caused or contributed to Mr. Love's death.)

The crux of the Estate's theory of liability, as illuminated by Officer Ball's and Dr. Corsi's deposition testimonies, is that the presence of an illuminated MIL signaled that the tractor should have been taken out of service, irrespective of the underlying mechanical explanation, in which case Mr. Burke would not have been present in the Indianapolis neighborhood and encountered Mr. Love. Ball Dep. 247:2–8, dkt. 195-1; Corsi Dep. 87:5–88:15, dkt. 258-1 at 22. Although we can surely "accept the reality behind [this] statement, that fact does not establish proximate causation." *Florio v. Tilley*, 875 N.E.2d 253, 256 (Ind. Ct. App. 2007) (citing *Milam v. State Farm Mut. Auto. Ins. Co.*, 972 F.2d 166, 169 (7th Cir. 1992) (" '[B]ut for' is rarely an adequate notion of cause. We do not say that since, in all probability, [a plaintiff] would not have had an accident on

---

[9] We assume the parties' references to SPN 520335-21, rather than SPN 520355-21, is a scrivener's error.

I-70 if Columbus had not discovered America, Columbus caused the accident.")). The Estate does not articulate how the collision that occurred here was a foreseeable consequence of the tractor's condition. To the contrary, the Estate's own expert witnesses (whom we have previously determined to lack the necessary expertise to interpret the tractor's fault codes) conceded that they had no opinions as to how any purported condition of the tractor contributed to the accident. Absent any evidence that the tractor suffered from a mechanical defect affecting its operation, the bare fact of the illuminated MIL does not generate a triable question of fact. Summary judgment shall be **granted** to Defendants, respectively, on the issue of the tractor's mechanical condition.

The Estate has also advanced (in its surreply brief) an argument that Daimler was negligent in its failure to retrofit the tractor with Side Guard Assist. Dkt. 199 at 18. Assuming that the Estate has not waived this theory by virtue of its failure to raise it in its response brief, this argument nonetheless lacks evidentiary and legal support. The record evidence—which the Estate did not contest in its response brief—establishes that Side Guard Assist was not available at the time the tractor was manufactured. Rieflin Decl. ¶ 6, dkt. 150-12. The Estate's surreply brief purports to identify a dispute of material fact by arguing that Daimler's "Side Guard Assist was available and could have been retrofitted on to the [tractor] years before the incident." Dkt. 199 at 9, 18. To substantiate this theory, the Estate attached to its surreply a single, unexplained exhibit, which appears to be a snapshot of Daimler's online promotional materials. *See* dkt. 199-1. At best, this exhibit corroborates Mr. Rieflin's Declaration as to the mere existence of the Side Guard Assist technology. However, this entirely unexplained evidence does not establish the existence of a genuine dispute of material fact as to *when* the technology became available and/or *whether* Daimler "could have" retrofitted the tractor involved in this litigation. The Estate's bare contentions to the contrary do not carry the weight the Estate attempts to place on them. Summary judgment shall be

**granted** to Daimler accordingly on the issue of the tractor's hazard detection/Side Guard Assist technology.

For these reasons, Daimler is entitled to summary judgment on the issue of its alleged negligent maintenance of the tractor, any alleged mechanical defect in the tractor, and its alleged failure to equip the tractor with Side Guard Assist technology. To the extent that such theories are asserted against TruckMovers and/or Mr. Burke, summary judgment is also appropriate, given the Estate's failure to adduce evidence demonstrating the existence of a material factual dispute concerning the condition and/or maintenance of the tractor.

In accordance with our prior discussion of Daimler's legal duty and the lack of evidence concerning Daimler's negligent maintenance and/or the existence of a mechanical defect in the tractor, we hold that no viable theory of liability against Daimler remains. Our subsequent discussion therefore focuses only on TruckMovers and Mr. Burke.

*2. TruckMovers's Alleged Negligence*

Again, we can quickly dispose of the Estate's arguments concerning TruckMovers's potential liability based on the negligent hiring of and/or entrustment to Mr. Burke of the responsibilities as a commercial truck driver. We recognize that the parties briefed the instant motions for summary judgment without the benefit of our April 21, 2026, order on Defendants' motions for judgment on the pleadings. As discussed in that order, however, TruckMovers's admission that Mr. Burke was acting within the course and scope of his employment effectively precludes the Estate's myriad claims of negligent hiring, training, supervision, retention, and entrustment against TruckMovers. Dkt. 315 at 5–9. Indiana law clearly establishes that where, as here, a motor carrier has admitted vicarious liability, additional evidence of the motor carrier's negligence is not "relevant to the issues in dispute, is wasteful of the court's time, and may be unnecessarily confusing to the jury."

*Levinson v. Citizens Nat'l Bank of Evansville*, 644 N.E.2d 1264, 1269 (Ind. Ct. App. 1994); *accord Bautista v. MVT Servs., LLC*, No. 16-CV-01086-NYW, 2017 WL 6054888, at *7 (D. Colo. Dec. 7, 2017) (Under Colorado law, motor carrier's admission of vicarious liability renders evidence of the motor carrier's compliance with the FMCSRs "simply not relevant" to the driver's alleged negligence.). Having previously dismissed the Estate's direct negligence claims against TruckMovers, we need not address further these potential bases of liability.

3. *Mr. Burke's Negligence*

The remaining controversies relate to the immediate circumstances of the accident and Mr. Burke's alleged negligent operation of the tractor. With the exception of Mr. Burke's alleged parking ordinance violation, which we can and will readily dismiss on the merits, we conclude that the record reflects the existence of triable questions of fact concerning the cause of Mr. Love's death and that summary judgment is therefore not appropriate.

**Parking Ordinance Violation**: Section 621-118(b) of the Indianapolis City Code provides, in relevant part, as follows:

> It shall be unlawful for the . . . operator or driver of any truck with more than two (2) axles (including the truck-tractor of a semi tractor-trailer) . . . to park such vehicle on or to permit it to be parked or to stand upon any street or alley in a residential district for a period of time longer than one (1) hour, except household or other moving or delivery trucks while actually loading or unloading property for adjacent residences or service trucks of persons while engaged in service calls at adjacent residences.

City Code § 621-118(b) (hereinafter, the "Parking Ordinance").

The Estate cites the Parking Ordinance to demonstrate that Mr. Burke operated the tractor in a residential area where such vehicles are legally prohibited from going. Mr. Burke's "unlawful presence" in a residential zone, the Estate contends, constitutes "negligence per se and supports a jury finding that the fatal collision would not have occurred had [Mr.] Burke simply complied with

the municipal restriction designed to keep heavy trucks away from pedestrians." Dkt. 177 at 4. The record evidence supports the conclusion that Mr. Burke parked the tractor along North Centennial Street for longer than one hour and that the purpose of Mr. Burke's presence was unrelated to moving or delivery services. *See* Burke Dep. 21:13–22:11, dkt. 195-7 at 5. That Mr. Burke ostensibly violated the Parking Ordinance is not dispositive, however.

Under Indiana law, "the unexcused violation of a statute or ordinance constitutes negligence per se if the provision (1) protects the class of persons in which the plaintiff is included and (2) protects against the type of harm which has occurred as a result of the violation." *Stachowski v. Est. of Radman*, 95 N.E.3d 542, 544 (Ind. Ct. App. 2018) (citation modified). Critically, the Estate here does not meaningfully engage with these essential prerequisites. Even if the Estate had addressed these elements, it "must still prove causation and damages just as in any other negligence claim." *Diocese of Fort Wayne S. Bend, Inc. v. Gallegos*, 203 N.E.3d 1080, 1084 n.2 (Ind. Ct. App. 2023). The Estate has entirely failed to articulate any way that Mr. Burke's apparent violation of the Parking Ordinance caused the fatal injury to Mr. Love, and, thus, it is entirely unclear how the duration of time that the tractor remained parked along a residential roadway caused or contributed to Mr. Love's death. *See Nesvig v. Town of Porter*, 668 N.E.2d 1276, 1285 (Ind. App. Ct. 1996) ("[T]he violation of a statutory duty is not actionable negligence unless it is also the proximate cause of the injury."). The Estate's *ipse dixit* assertion that Mr. Burke's "illegal presence in the residential district is itself a direct causal link" to Mr. Love's tragic death, dkt. 177 at 8, is both far-fetched as a theory of recovery and fails to build a logical bridge between the text of the Parking Ordinance and the harm that ensued. This negligence per se theory therefore fails as a matter of law.

**<u>The Estate's Remaining Theories</u>**: The Estate's remaining theories relate to allegations of operator error: Specifically, the Estate contends that Mr. Burke's cocaine usage impaired his ability to safely operate the tractor and that Mr. Burke's failure to brake the vehicle and reach a complete stop at the stop sign, his failure to to yield the right-of-way and to maintain a proper lookout all contributed to Mr. Love's death. Viewing the record in the light most favorable to the Estate, a reasonable jury could conclude that Mr. Burke's operation of the tractor fell short of the standard of care and proximately caused the accident that took the life of Mr. Love. The record contains significant but unanswered questions about Mr. Burke's cocaine usage and the potentially impairing effects such substance had on his ability to operate a large commercial vehicle in a residential/urban neighborhood. Mr. Burke's failure to fully stop at the stop sign before executing an (arguably) unsafe left, coupled with his apparent failure to notice that Mr. Love had made contact with his tractor, reflect the types of issues that a jury is entitled to weigh in assessing the merits of the Estate's wrongful death claim. TruckMovers and Mr. Burke's motion for summary judgment on these remaining questions of fact shall therefore be **denied**.

## III. Indiana's Comparative Fault Act

Under Indiana's Comparative Fault Act, a plaintiff's own degree of fault may diminish, and in some cases preclude, her recovery. *See* Ind. Code § 34-51-2-5. "[A] plaintiff whose own negligence contributes as much as 49 percent to her injury may recover from a defendant whose acts provided 51 percent." *Areche v. Indianapolis Dep't of Pub. Works*, 264 N.E.3d 84, 89 (Ind. Ct. App.), *trans. denied,* 267 N.E.3d 987 (Ind. 2025). Where a "claimant's contributory fault is greater than the fault of all persons whose fault proximately caused or contributed" to her injury, however, "the claimant is barred from recovery." Ind. Code § 34-51-2-6. "[C]omparative fault is normally an issue for the jury in Indiana, [though] summary judgment is still appropriate if 'there is no

dispute in the evidence and the factfinder is able to come to only one logical conclusion.' " *Reales v. Consol. Rail Corp.*, 84 F.3d 993, 997 (7th Cir. 1996) (quoting *Thiele v. Norfolk & W. Ry. Co.*, 68 F.3d 179, 184 (7th Cir. 1995)).

"[U]nder the doctrine of contributory negligence, the issue is whether the plaintiff failed to exercise ordinary care for his safety under the circumstances." *Nesvig*, 668 N.E.2d at 1281. As reflected in the Indiana Code, pedestrians "may not suddenly leave a curb or other place of safety and walk or run into the path of a vehicle that is so close as to constitute an immediate hazard." Ind. Code § 9-21-17-5. When "crossing a roadway at a point other than within a parked crosswalk or within an unmarked crosswalk at an intersection," pedestrians must also "yield the right-of-way to all vehicles upon the roadway." Ind. Code § 9-21-17-7. *See also id.* § 9-21-17-15 ("[A] pedestrian upon a roadway shall yield the right-of-way to all vehicles upon the roadway."). Where drivers "are under a common law duty to maintain a proper lookout while traveling on the roadways," pedestrians owe a corresponding duty not "to proceed heedlessly across a street without exercising ordinary care for [their] own safety." *Nesvig*, 668 N.E.2d at 1281. "A pedestrian must at all times exercise ordinary care for his own safety and is required to avail himself of all his faculties to avoid any danger or injury." *Id.* Accordingly, Mr. Love "had a statutory duty to yield to a vehicle in the roadway as well as a common law duty to exercise ordinary care and avail himself of all his faculties to avoid danger or injury." *Id.*

Here, TruckMovers and Mr. Burke contend that Mr. Love and Mr. Love alone proximately caused the accident. In their view, Mr. Love was more than fifty percent responsible for the accident, and, as a consequence, Indiana law forecloses the Estate's recovery. Defendants assert that the facts of this case are akin to those presented in the Seventh Circuit's 1996 decision in *Reales v. Consolidated Rail Corporation*, 84 F.3d 993 (7th Cir. 1996). In *Reales*, a fifteen-year-old bicyclist

was struck and killed by a train as she attempted to cross the railroad tracks. *Id.* at 995. The record evidence established "that the gates were down, the flashers were operating, and the train was sounding its horn." *Id.* at 995. Nevertheless, eyewitness accounts established that the decedent maneuvered her bike around the automatic gates and, despite her momentary hesitation, proceeded across the tracks, tragically resulting in her death. *Id.* at 995, 997. The district court entered summary judgment in favor of the railroad defendant, finding that the train was operating below the federally prescribed speed limit and that the undisputed record evidence established that the decedent was more than fifty percent at fault, thereby precluding the estate's recovery under Indiana's Comparative Fault Act. *Id.* at 996. The Seventh Circuit affirmed, holding that "no reasonable finder of fact could have found that [the defendant's] fault was equal to or greater than" the decedent's. *Id.* at 997. To the contrary, the Seventh Circuit continued, "it [wa]s hard to imagine what precaution the railroad could have taken that it did not, on th[o]se facts." *Id.*

Defendants contend that Mr. Burke, like the railroad in *Reales*, could not have avoided the accident in this case. As such, Defendants continue, no reasonable jury could find Mr. Burke legally responsible for Mr. Love's death. Although instructive, *Reales* does not automatically impel the conclusion urged by TruckMovers and Mr. Burke that Mr. Love was more than fifty percent at fault for his death in part because the instant record is not nearly as complete and clearcut as that presented in *Reales* such that a single reasonable inference concerning the allocation of fault between Mr. Burke and Mr. Love arises.

As noted above, a reasonable jury could credit the Estate's various arguments concerning the deficiencies in Mr. Burke's operation of the tractor, including his arguable failure to maintain a proper lookout, and find that Mr. Burke proximately caused Mr. Love's death. Equally possible, a reasonable jury could, weighing the evidence as a whole, find that Mr. Love's decision to enter

the roadway and to navigate behind the tractor reflected a dereliction from his duty to exercise ordinary care for his own safety and rendered Mr. Love more than fifty percent at fault for the accident. We recognize that "this is a close case," and the Estate likely may face an uphill battle in persuading a jury. *Indianapolis Pub. Transportation Corp. v. Bush*, 266 N.E.3d 719, 729 (Ind. 2025). However "our role is not to stand in the place of the factfinder. Instead, we are confined to determining whether, considering the evidence in the light most favorable to the Estate, the only reasonable inference is that" Mr. Love's comparative fault exceeds fifty percent. *Id.* On the record before us, we cannot reach that conclusion. Accordingly, the question of comparative fault (and Mr. Love's negligence) must go to the jury, and TruckMovers's and Mr. Burke's motion for summary judgment shall be **denied** accordingly.

## IV. Damages

### A. Recovery under the General Wrongful Death Statute

A recurring point of contention in this litigation relates to the Estate's efforts to obtain an award of damages under Indiana's General Wrongful Death Statute (the "GWDS"), Ind. Code. § 34-23-1-1, as opposed to the Adult Wrongful Death Statute (the "AWDS"), Ind. Code. § 34-23-1-2. As we have outlined in prior orders, *see generally* dkt. 315, 353, the salient difference between the GWDS and the AWDS distills to recoverable damages, with the GWDS allowing for a greater recovery than the AWDS. Only one factor matters here: "[T]he determination of dependency controls which statute (the GWDS or the AWDS) applies." *Hubbard v. City of Bedford, Indiana*, No. 4:24-cv-00103-TWP-KMB, 2025 WL 1939879, at *4 (S.D. Ind. July 11, 2025) (citing *Est. of Sears v. Griffin*, 771 N.E.2d 1136, 1138–39 (Ind. 2002)).

On April 21, 2026, we granted TruckMovers's (second) motion for judgment on the pleadings and dismissed the Estate's claim arising under the GWDS due to an absence of sufficient

factual allegations in the complaint from which a plausible inference of dependency might arise. Dkt. 315. On July 16, 2026, we denied the Estate's ensuing motion to reconsider, though we also noted an apparent discrepancy between "the contents of the pleadings, as challenged by Defendants previously, and an apparent understanding among the parties that the Estate is and has been 'patently engaged in endeavoring to prove' damages under the GWDS." Dkt. 353 at 12 (quoting *Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005)). Our July 16th Order stopped short of "conclusively resolv[ing] the contested status of the Estate's (apparently ongoing) efforts to shore up proof of damages under the GWDS," however, and "reserve[d] for future consideration whether Defendants' pretrial maneuvering . . . reflect[ed] their consent to try these issues, regardless of their . . . objections to the contrary." *Id.*

Returning to the instant motions, TruckMovers and Mr. Burke have moved for summary judgment, asserting that the Estate has failed to adduce sufficient evidence from which a reasonable jury could conclude that minors C.W., K.L., and T.L. were Mr. Love's dependent heirs. Dkt. 142 at 14–16; dkt. 148 at 8–9. It is a "well-known rule that a pleading can be constructively amended when both parties expressly or impliedly consent to constructive amendment." *Hutchins v. Clarke*, 661 F.3d 947, 957 (7th Cir. 2011) (citations omitted). "The test for consent is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence had he known sooner the substance of the amendment." *Id.* (citation omitted). Given that Defendants themselves have explicitly sought summary judgment on the issue of dependency, which issue is now fully briefed and "squarely addressed" by all parties, we regard "the complaint [as] constructively amended to include that claim," notwithstanding our prior ruling to the contrary. *Whitaker v. T.J. Snow Co.*, 151 F.3d 661, 663 (7th Cir. 1998); *see also Walton v. Jennings Cmty. Hosp., Inc.*, 875 F.2d 1317, 1320 & n.3 (7th Cir. 1989) ("Although it is the judge rather than the

parties who introduced the amendment, and although the amendment was effected during consideration of a motion for summary judgment rather than at trial, it is fully consonant with the spirit of Rule 15(b) and existing case law to view the pleadings as constructively amended . . . .).[10]

The GWDS provides that the proceeds of the wrongful death shall "inure to the exclusive benefit of the widow or widower, as the case may be, and to the dependent children, if any, or dependent next of kin, to be distributed in the same manner as the personal property of the deceased." Ind. Code § 34-23-1-1. The Indiana "legislature set forth two conditions for recovery under the wrongful death statute: dependency and heirship. If . . . these [two factors] cannot [both] be shown by the claimant, then that person is precluded from recovering as a dependent under the wrongful death statute." *Necessary v. Inter-State Towing*, 697 N.E.2d 73, 80 (Ind. Ct. App. 1998). As to the requirement of heirship, the GWDS "specifically links a beneficiary's right to recovery under the statute with his or her right to receive a distribution of the decedent's personal property." *Johnson Controls, Inc. v. Forrester*, 704 N.E.2d 1082, 1084 (Ind. Ct. App. 1999) (citation modified). "If one is not an heir entitled to share in the distribution of the decedent's personal property, one is not entitled to damages under the wrongful death statute, dependency notwithstanding." *Necessary*, 697 N.E.2d at 80.

In order to determine whether minors C.W., K.L., and T.L. qualify as Mr. Love's "dependent children" within the meaning of the GWDS, we must evaluate their "right to maintain a claim for inheritance against [their] father's estate under the laws of intestate succession[ ] or to enforce parental obligations under the paternity statute against the father's estate." *S.M.V. v. Littlepage*, 443

---

[10] Because we regard the Estate's complaint as constructively amended apropos of the GWDS, its pending motion for leave to file a third amended complaint shall be **denied as moot**. Dkt. 354.

N.E.2d 103, 110 (Ind. Ct. App. 1982). In order to establish the paternity of nonmarital children, such as the minors here, Indiana law requires that one of the following is satisfied:

> (1) The paternity of a child who was at least twenty (20) years of age when the father died has been established by law in a cause of action that is filed during the father's lifetime.
>
> (2) The paternity of a child who was less than twenty (20) years of age when the father died has been established by law in a cause of action that is filed:
>
> > (A) during the father's lifetime; or
> >
> > (B) within five (5) months after the father's death.
>
> (3) The paternity of a child born after the father died has been established by law in a cause of action that is filed within eleven (11) months after the father's death.
>
> (4) The putative father marries the mother of the child and acknowledges the child to be his own.
>
> (5) The putative father executed a paternity affidavit in accordance with IC 31-6-6.1-9(b) (before its repeal).
>
> (6) The putative father executes a paternity affidavit as set forth in IC 16-37-2-2.1.

Ind. Code § 29-1-2-7(b). "The testimony of the mother may be received in evidence to establish such paternity and acknowledgment, but no judgment shall be made upon the evidence of the mother alone." *Id.* § 29-1-2-7(c). "The evidence of the mother must be supported by corroborative evidence or circumstances." *Id.* As recognized by Indiana courts, the intestate succession and paternity statutes reflect "Indiana policy and define the rights of [nonmarital] children in relation to

their putative fathers," though they also "create higher evidentiary requirements for recovery than those imposed on [marital] children enforcing the right to support." *Littlepage*, 443 N.E.2d at 109.

Here, the undisputed evidence adduced by Defendants establishes that Mr. Love was never married to either Ms. Allen or Ms. Thompson, though he did cohabitate with each at or around the time of the minors' respective births. Mr. Love and Ms. Allen were engaged for an undisclosed period of time before C.W.'s birth. Allen Dep., dkt. 142-14 at 2. Ms. Allen's and Ms. Thompson's deposition testimonies corroborate that the minors were less than twenty years of age at the time of Mr. Love's death. *See* Allen Dep., dkt. 142-14 at 2; Thompson Dep. 18:3–20:7, dkt. 142-13 at 2.

Applying Indiana's intestate succession and paternity statutes to these facts, we have little trouble concluding that the Estate has failed to adduce evidence of Mr. Love's paternity, thereby entitling Defendants to judgment as a matter of law. Indeed, the Estate has marshaled no evidence in its summary judgment response to demonstrate that (1) Mr. Love's paternity was established during his lifetime or within five months of his death; (2) Mr. Love married Ms. Allen and acknowledged paternity of C.W.; (3) Mr. Love married Ms. Thompson and acknowledged paternity of K.L. and/or T.L.; or (4) that Mr. Love executed a paternity affidavit.

The Estate's sole response appears in its brief in opposition to Daimler's summary judgment motion, where it argues that the operative complaint "alleges that Mr. Love's minor children relied on him for support, care, and daily needs" and that Ms. Thompson's "testimony (which was not used here by request) supports these allegations, and no evidence contradicts them." Dkt. 172 at 7.

Under no sound interpretation of the well-established rules governing summary judgment does the Estate's bareboned and superficial response suffice to survive Defendants' challenge. "Summary judgment is the 'put up or shut up' time in litigation." *Brown v. CACH, LLC*, 94 F.4th

665, 667 (7th Cir. 2024). As such, "the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). "[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court *must* enter summary judgment against her." *Waldridge*, 924 F.3d at 920. Here, the Estate's mere gesturing towards its complaint and Ms. Thompson's "testimony" falls well short of its burden in resisting summary judgment on the issue of the minors' heirship. Since the Estate has failed to adduce evidence supporting a conclusion of heirship, there is no issue of material fact precluding summary judgment. *See also Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (district court has no duty to "scour the record" in search of admissible evidence to "make the lawyer's case"). Thus, recovery of damages by the Estate will be subject to the terms and conditions of the AWDS.

**B. Damages for Pain & Suffering, Mental Anguish, & Physical Impairment**

In the Second Amended Complaint, the Estate seeks damages for physical pain and suffering, mental anguish, and physical impairment. SAC ¶ 90, dkt. 66. TruckMovers and Mr. Burke argue that summary judgment on these categories of damages is required because Indiana law does not permit such recovery under its wrongful death statutes. Dkt. 142 at 16–17. The Estate contends that its claims focus squarely on the categories of damages authorized by Indiana statute and that concerns about what damages may ultimately be awarded can be "cleanly resolved" at trial. Dkt. 177 at 10.

"Because wrongful death actions are purely creatures of statute, they are strictly construed." *Ed Wiersma Trucking Co. v. Pfaff*, 643 N.E.2d 909, 911 (Ind. Ct. App. 1994), *opinion adopted,* 678 N.E.2d 110 (Ind. 1997). Indiana law is clear that "[o]nly those damages prescribed by the applicable wrongful death statute are recoverable . . . ." *Edna Martin Christian Ctr., Inc. v. Smith*, 202

N.E.3d 1118, 1121 (Ind. Ct. App. 2023). The AWDS specifically provides that damages "may not include . . . damages awarded for a person's grief; or . . . punitive damages." Ind. Code § 34-23-1-2(c)(2). Damages may include but are not limited to "[r]easonable medical, hospital, funeral, and burial expenses necessitated by the wrongful act or omission that caused the adult person's death" as well as "[l]oss of the adult person's love and companionship." *Id.* § 34-23-1-2(c)(3). Wrongful death damages are, at bottom, tethered to pecuniary losses; hence, damages "relat[ing] to loss of life, grief, and wounded feelings are not recoverable." *Smith*, 202 N.E.3d at 1124. Because wrongful death damages are intended to "compensate the decedent's relatives for the loss sustained by reason of the death," damages for pain and suffering and for physical impairment are similarly not recoverable. *Atterholt v. Robinson*, 872 N.E.2d 633, 641 (Ind. Ct. App. 2007).

A straightforward application of these established legal principles to the case at bar impels the conclusion that Indiana law precludes the Estate from recovering non-pecuniary damages relating to pain and suffering, mental anguish, and physical impairment. TruckMovers and Mr. Burke's motion summary judgment shall be **granted** accordingly.

**CONCLUSION**

For the reasons outlined above, the Court rules as follows:

- TruckMovers's Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part**. Dkt. 141.
- Daimler's Motion for Summary Judgment is hereby **GRANTED**. Dkt. 146.
- Daimler's and TruckMovers's Motions to Strike the Estate's Objections are hereby **GRANTED**. Dkt. 197, 205. The Estate's Objections are hereby **STRICKEN**. Dkt. 193, 194.

- TruckMovers and Mr. Burke's Motion to Exclude Officer Ball's Testimony is hereby **GRANTED in part** and **DENIED in part**. Dkt. 253.
- Daimler's Motion to Exclude Officer Ball's Testimony is hereby **GRANTED in part** and **DENIED in part**. Dkt. 259.
- TruckMovers and Mr. Burke's Motion to Exclude Thomas Corsi's Testimony is hereby **GRANTED in part** and **DENIED in part**. Dkt. 249.
- Daimler's Motion to Exclude Thomas Corsi's Testimony is hereby **GRANTED in part** and **DENIED in part**. Dkt. 257.
- Defendants' Motion to Exclude Michael Suls's Testimony is hereby **DENIED**. Dkt. 255.
- Defendants' Joint Motion to Strike is hereby **GRANTED**. Dkt. 272. The Estate's Motions to Exclude Rachel Kelly, Jerad Childress, and Madeleine J. Swortwood are hereby **STRICKEN**. Dkt. 266, 267, 268.
- Daimler's Motion to Strike is hereby **GRANTED**. Dkt. 275. The Estate's Motion to Exclude Kirk Cummings is hereby **STRICKEN**. Dkt. 271.
- The Estate's (fifth) Motion for Leave to Amend is hereby **DENIED as moot**. Dkt. 354.

No partial final judgment shall issue.

This litigation shall proceed to trial only on the Estate's claims against TruckMovers and Mr. Burke.

IT IS SO ORDERED.

Date: 8/28/2026

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Aaron C. Cox
aaron.cox@icemiller.com

Ramona Frazier
The Witherspoon Law Group
rfrazier@twlglawyers.com

Christina Laun Fugate
ICE MILLER LLP (Indianapolis)
christina.fugate@icemiller.com

Tiffany R. Guthrie
Kightlinger & Gray, LLP
tguthrie@k-glaw.com

Christopher Sean Hennessy
Cozen O'Connor
chennessy@cozen.com

Andrea Howell
Ice Miller LLP
andrea.howell@icemiller.com

Thomas J. Jarzyniecki, Jr.
KIGHTLINGER & GRAY, LLP (Indianapolis)
tjarzyniecki@k-glaw.com

Paul K Leary, Jr
Cozen O'Connor
pleary@cozen.com

Jeremy D. Lemon
HUNT SUEDHOFF & KALAMAROS LLP (Fort Wayne)
jlemon@hsk-law.com

Derek Harold MacKay
Knight MacKay Morrow, LLC
mackay@kmmlaw.com

Kathleen Meara
Knight MacKay Morrow, LLC
meara@kmmlaw.com

Aubrey Nick Pittman

The Pittman Law Firm, P.C.
pittman@thepittmanlawfirm.com

Carolyn E. Riggs
ICE MILLER LLP (Indianapolis)
criggs@fbtgibbons.com

Linje Rivers
The Witherspoon Law Group
rivers@twlglawyers.com

Tasha Rebecca Roberts
ROBERTS LITIGATION GROUP
troberts@robertslitigation.com

Nuru Witherspoon
Nuru Witherspooon
stegall@twlglawyers.com